Arthur J. BUSTAMANTE, Sr.,
Appellant,

v.

STATE of Indiana, Appellee.

No. 50S00–8712–CR–1167.

Supreme Court of Indiana.

Aug. 7, 1990.

Robert O. Bowen, Bremen, for appellant.

Linley E. Pearson, Atty. Gen., Joseph N. Stevenson, Deputy Atty. Gen., Indianapolis, for appellee.

**DeBRULER, Justice.**

Appellant was indicted by a Marshall County grand jury for murder, I.C. 35–42–1–1(1); felony murder, I.C. 35–42–1–1(2); and arson, a Class A felony, I.C. 35–43–1–1(a), in connection with the death of his wife, Gloria Bustamante, which resulted from a fire at their home. He was then tried to a jury, which returned guilty verdicts on all three counts. The trial court merged the felony murder conviction into the murder conviction and sentenced appellant to sixty years on that count and to thirty years on the arson count. The court ordered that the two sentences be served concurrently, resulting in a sixty-year executed sentence. Appellant now brings this direct appeal, challenging the court's rulings on hearsay issues, the sufficiency of the evidence, and the sentencing procedure. Appellant also alleges that the trial court erred by not providing him with a complete transcript of the grand jury proceedings and by denying his motion for a new trial based on newly discovered evidence.

## I. Hearsay

### A. Letter

Appellant asserts that the trial court committed reversible error by admitting, over his objection, a letter dated October 21, 1986, approximately a week before the fire. The letter was written by Gloria Bustamante to her mother, Frances Dahl. In the letter, Gloria described the Bustamantes' efforts to make money through the sale of some personal items and an unsuccessful application for a bank loan and told her mother that she and appellant had recently acquired jobs. She also asked Dahl for a loan of $1,000:

Mama, I hate to ask but I was wondering if we could borrow $1000.00 for now. Maybe by the end of the year we can pay you back $100.00 a month.... If you can't—don't worry—I will understand. Here is a list of why we need it.

| | | |
|---|---|---|
| House | $ 411.01 | (Oct) |
| Tires | 150.00 | |
| Battery | 50.00 | |
| My Eye Glasses | 125.00 | |
| Utilities | 150.00 | part of Sept & Oct |
| | 86.01 | |
| | 411.01 | (Nov) |
| TOTAL | $1297.02 | |

Appellant argues that the letter was improperly offered to establish the fact of appellant's financial need and the existence of a motive for him to set the fire.

▮▮▮ Hearsay is an out-of-court statement offered to prove the truth of the facts asserted therein and rests on the credibility of a declarant who is not in court and is unavailable for cross-examination. *Hughes v. State* (1989), Ind., 546 N.E.2d 1203. If challenged evidence is hearsay and does not fall within one of the exceptions to the rule, then it is inadmissible. *Indianapolis Newspapers, Inc. v. Fields* (1970), 254 Ind. 219, 259 N.E.2d 651 (2–2 decision; DeBruler, J.). That part of Gloria's letter which requested a loan from her mother is not hearsay at all because it asserted no fact as true which was susceptible to being true or false. True requests, commands, and questions are not assertions, and evidence regarding such utterances may come in because they are not offered for the truth of the facts asserted. *Mayhew v. State* (1989), Ind., 537 N.E.2d 1188 (per curiam); *Indianapolis Newspapers*, 254 Ind. 219, 259 N.E.2d 651.

In *Hughes v. State*, 546 N.E.2d 1203, a married couple was murdered by their daughter's boyfriend, and a friend of the murdered woman testified that she believed the victims wished to limit the amount of time their daughter spent with the defendant and, over defense objection, that the woman had told her that they had imposed a curfew on their daughter. This Court held that this testimony was not hearsay and therefore admissible because the witness's "testimony was offered not to prove the truth of the matter asserted by [the victim], but was introduced to establish her state of mind concerning her relationship with [her daughter] and the circumstances which led to the victims' deaths." *Id.* at 1208.

Here, by contrast, those parts of Gloria's letter which described the Bustamantes' efforts to make and earn money and which listed the debts to be paid with the loan requested from Dahl were introduced to establish as true her negative assessment of the family's financial situation and carried the plain inference that appellant had made the same assessment and therefore had the state of mind and a reason to set fire to the house. As such, it was hearsay, and because it did not fall within one of the exceptions to the hearsay rule, its admission by the trial court was error. This was an error of state law. As such, it is subject to state harmless error analysis. An error of this type will result in reversal only if it appears that there was prejudice to appellant's substantial legal rights. *Harvey v. State* (1971), 256 Ind. 473, 269 N.E.2d 759. Other evidence, namely, a handwritten promissory note signed by both appellant and Gloria and testimony regarding the circumstances surrounding that note, provided proof independent of Gloria's letter supporting the inference that appellant felt financial pressure. Therefore, the error in the admission of the letter by the trial court was harmless.

### B. Out-of-Court Statement

Appellant called Bill Billings to question him regarding a conversation he had with one Christopher Cotton, and the State objected on hearsay grounds. In an offer to prove outside the presence of the jury, Billings testified that during a conversation he had with Cotton and two other witnesses, Cotton suggested that he knew something more about the fire at the Bustamante residence than was known generally.[1] At the time of trial, Cotton was incarcerated in the Marshall County Jail and was under subpoena by appellant, and during the offer to prove, Billings stated to the court that Cotton was being held under an arson charge. Following Billings's testimony, the State renewed its objection, which the trial court sustained. Appellant asserts that this ruling was erroneous un-

der *Patterson v. State* (1975), 263 Ind. 55, 324 N.E.2d 482, and its progeny, arguing that no hearsay problem existed here since Cotton was under subpoena and incarcerated and therefore was available for cross-examination by the State. Appellant's argument fails, however, because the foundational requirements for admission of evidence under the *Patterson* rule are not met under this scenario. In order to admit what would otherwise be inadmissible hearsay under the *Patterson* rule, the out-of-court declarant must not only be accessible to the opposing side for purposes of cross-examination, but must be present at trial and must, in fact, be called as a witness by the proponent of the hearsay statement at some point in the proceedings. *Watkins v. State* (1983), Ind., 446 N.E.2d 949, 961 (citing with approval *D.H. v. J.H.* (1981), Ind. App., 418 N.E.2d 286). Furthermore, Cotton was under appellant's own subpoena, and nothing in the record or appellant's brief explains why appellant did not call Cotton to the stand. Since Cotton was available to testify to what he knew, the court's ruling, which prevented Billings from testifying as to what Cotton knew, could not but be harmless error.

### II. Sufficiency of the Evidence

At approximately 12:35 a.m. on October 27, 1986, a fire broke out and destroyed appellant's home in Bremen. His wife, Gloria Bustamante, was trapped upstairs and died of carbon monoxide poisoning due to smoke inhalation. Following an investigation, it was determined that the cause of the fire was arson. Appellant acknowledges an abundance of evidence showing that the fire which resulted in the death of his wife was arson, but argues that the evidence identifying him as the perpetrator of these crimes was entirely circumstantial in nature and insufficient to sustain his convictions. Elements of offenses and identity may be established entirely by circumstantial evidence and logical inferences drawn therefrom. *McVey v.*

---

1. The parties stipulated that testimony of the other two witnesses would be substantially similar to that of Billings and that the trial court would make the same ruling on the admissibility of their testimony as it did the testimony of Billings.

*State* (1988), Ind., 531 N.E.2d 458. On appellate review of circumstantial evidence of guilt, this Court need not determine whether the circumstantial evidence is adequate to overcome every reasonable hypothesis of innocence, but rather whether inferences may be reasonably drawn from that evidence which support the verdict beyond a reasonable doubt. *Kidd v. State* (1988), Ind., 530 N.E.2d 287.

■■■ The facts adduced at trial, when viewed in a manner favorable to the verdict, show the following: Rodney Leeper, appellant's neighbor, testified that between 12:30 and 12:35 a.m. on October 27, 1986, he awoke to the sound of yelling from the street. Thinking it was kids, he did not get up. Then he heard the sound of glass breaking and rolled over to look out the window next to his bed. He saw fire coming out of the south dining room window of the Bustamante residence and appellant standing in his driveway in front of his garage. Leeper immediately called the fire department and started next door. By the time he got across the street, the flames from the window had climbed up the side of the house to halfway to the bottom of the second story window, and appellant was looking and pointing to the upper part of the house, shouting that his wife was inside.

Firefighters responded within four minutes of Leeper's call, and fire investigators testified at trial that the "total involvement" in the fire of the downstairs at the time firefighters arrived indicated to them from the beginning that the fire was probably arson, as accidental fires tend to be more localized, move more slowly, and have the most extreme damage centered around a single point of origin. Firemen spent twenty to thirty minutes suppressing the flames and heat to the point that they could enter to look for Gloria.

Once the fire was out, investigation of the burn and smoke patterns in the house suggested that an accelerant had been used. Inconsistent degrees of charring on the same pieces of furniture and areas of walls, floors, and doorways indicated that liquid accelerant had been slopped up onto the more badly burned areas.

The burn pattern showed that the accelerant, with one isolated exception, had been poured in a continuous flow in every room of the downstairs, which explained the total involvement of that part of the house in the flames. All routes of escape from the upstairs through the downstairs were cut off; the burn pattern showed that accelerant had been poured on the bottom three or four stairs leading to the upstairs and through all the interior doorways, thereby blocking access to any exterior door. The downstairs bedroom, where appellant kept his clothing and personal belongings, was the only room in the lower portion of the house that was not totally devastated. That room suffered limited burn damage, but investigators found an isolated area which was burned through the carpet to the floor where accelerant had been poured in a straight line on the floor at the foot of the bed. This burn area was also the only one that was not connected to the continuous pour path displayed in the rest of the downstairs.

Jack Sanderson, a private investigator, testified that, once poured, liquid accelerant begins to vaporize, then when ignited, the vapors flash and spread immediately. The flames spread from the center of the ignition point, out in all directions, and at an equal rate of speed. There is no period of smoldering and smoking before flames erupt. He testified that given the way flames travel in an accelerated fire and the way smoke travels, the first story of a two-story house would be almost fully involved in flames before smoke reached the second story. Bremen Fire Chief Lowell Martin testified that where liquid accelerants are used, a house can be totally involved in flame in a matter of seconds, less than a minute. John Kreiter, an investigator for the State Fire Marshall at the time of this fire, testified that the speed of the flash varies depending on, among other things, the amount of heat and humidity already present in the room and how much time passes between the introduction of the accelerant and ignition.

Kreiter testified further that although the exact ignition point of this fire could not be determined, it was his opinion that the fire had to have been started from an opening in the structure. He stated that the dining room window could have been broken out prior to the fire. In Sanderson's opinion, the fire was started from the back door. This opinion was based on the smoke and burn patterns in that area, the fact that this area tested positive for the presence of accelerant, and his belief that this would be the only safe place for the arsonist to ignite the fire. He stated that, in his opinion, anyone standing in the downstairs interior of the house at the time the accelerant ignited would have been caught in the flash and unable to reach an exterior door. He also testified that, given the area of the house affected, anywhere from two to five gallons of accelerant would have been used to start this fire.

Examination of the interior and exterior of the house revealed the existence of the following physical evidence: No smoke detector or fire alarm was found on the premises. No metal containers in which accelerant might have been carried were found in the house. A red, five-gallon gas can, which was half full, was found in a utility shed at the side of the house. Next to the utility shed were four, five-gallon metal containers or buckets, two stacked on top of the other two. Appellant had told the police that he had locked all the doors prior to going to bed, and Martin testified that the front door was closed and locked when he arrived and that the firemen had broken it down to gain access to the fire. Other than this, there was no sign of forced entry into the house. The area above the back door displayed a smoke pattern indicating that it had been open during the hottest part of the fire and, at the time photographs of the scene were taken, this door was propped open by a bicycle. Fireman Kulzcar testified that another fireman, upon reaching the top of the stairs, broke out the west window for ventilation. Outside and below that window stood the utility shed. Sanderson testified that the smoke pattern above that window indicated that it was broken out either during the

late stages of the fire or by a fireman during its suppression.

Gloria Bustamante's body was found in the south upstairs bedroom, which was directly above the dining room. The smoke pattern showed that the dining room window was either broken or burned out in the early stages of the fire. Wedel testified that it is unlikely that the dining room window blew out because if the pressure in the house was so great as to blow out that window, in all probability, every window in the downstairs would have blown out at the same time. Kulzcar testified that the window in the bedroom in which the body was found was burned up in the fire. Kreiter testified that all of the doors and windows, with the exception of those already mentioned, were intact at the time the fire occurred and had not been broken out by the fire.

A videotaped walk-through of the house was made after the fire which showed the condition of both the burned and intact areas of the house. The portion of the tape which shows the Bustamantes' bedroom indicated that only one person had been in the bed that night, and the side on which appellant had indicated his wife typically slept was the side that appeared to have been occupied.

Appellant was not injured in the fire, and witnesses for the State and the defense testified that there were no burns, singes or smoke marks on the appellant's clothing, face or hands. The pajama bottoms he was wearing at the time of the fire were chemically tested and showed the presence of no detectable accelerant residue.

The State produced evidence of the Bustamantes' financial and personal difficulties and of life and home insurance proceeds which would accrue to appellant as a result of the fire. Cecelia Maner, Gloria's daughter, testified that appellant and Gloria lived in Texas before moving to Indiana and that she had lived with them part of that time and visited frequently after she moved out. She testified that the Bustamantes argued frequently and that three or four times, she had observed damage to their home and furnishings and bruises on her moth-

er's body. Maner visited the Bustamantes in Indiana in January of 1986, and appellant and Gloria fought the entire ten days. At one point, Maner took her son in another room to get him away from the arguing, and when she returned, she discovered that her mother had locked herself in a closet and was crying. At the end of her visit, Maner told Gloria that appellant would kill her once Maner left and persuaded Gloria to return to Texas with her. Gloria stayed in Texas a week, and Frances Dahl, Gloria's mother, testified that she begged Gloria not to go back to appellant because he would kill her if she did. Both Dahl and Maner testified that appellant had left Gloria several times in the last six years of their ten-year relationship and that during those times, he lived with his ex-wife.

Rita Trevino and Wilma Leeper, friends of Gloria's, testified that appellant and Gloria had an uneven relationship, getting along very well at times and not at all at other times. Leeper stated that she could telephone Gloria only at times when Gloria knew appellant would not be home, that Gloria often cried when they talked on the phone, and that she saw gifts that she had given to Gloria broken and stacked up at the side of the house.

The State introduced a handwritten promissory note, signed by appellant and his wife, which showed that the Bustamantes borrowed $900 "for personal reasons" from their neighbors, Roy and Rita Trevino, a month before the fire. Rita testified, without timely objection, that she knew neither of the Bustamantes had jobs at the time and that Gloria had told her that they were about to lose everything they had. She stated that she and her husband asked appellant how much they needed, and that after the Bustamantes calculated their expenses, the Trevinos took out a loan from the bank and then loaned the money to them in exchange for the note, which was dated September 13, 1986, and payable in ninety days.

A life insurance policy was taken out on June 1, 1986, insuring Gloria Bustamante's life against accidental death in the amount of $8,250. Under a policy taken out by the

Bustamantes at the time they purchased the house in July of 1985, appellant was eligible to claim $112,000, which covered the loss of the dwelling and personal property and living expenses.

Appellant testified in his own behalf that he and his wife went to bed at about 10:30 p.m. on the night of the fire. He stated that he was awakened either by the smell of smoke or the sound of a smoke alarm and went downstairs to see if Gloria had left something burning on the stove. Appellant stated on cross examination that he felt nothing cold or wet underfoot as he walked down the stairs and through the dining room to the kitchen. After he checked the stove, he turned and moved back toward the doorway, but did not reenter the dining room. He testified that he saw smoke in that room, and then flames flared and windows broke. He stated that he ran out the back door and tried to reach his wife by climbing onto the roof via the utility shed, but that when he saw smoke coming out of the upstairs bedroom window, he abandoned this attempt and went to his neighbor's house to call for help. He returned to the house and circled it, calling for Gloria to wake up and try to get out a window. Appellant denied that he set the fire or killed his wife.

Appellant also presented evidence that there had been smoke alarms in the house, that the Bustamantes had never missed a mortgage payment, and that the loan from the Trevinos had been paid back on time. Debbie Haynes, appellant's former daughter-in-law, testified that she spoke with Gloria on the night of the fire and that Gloria seemed to be in a very good mood. State and defense witnesses testified uniformly that appellant's primary concern on the night of the fire was to get Gloria out of the house, that he was hysterically calling to her and for them to help her, and that he made several attempts to return to the house and had to be physically restrained by his sons and an emergency medical technician.

From this evidence, the jury could have inferred that the person who set the fire which killed Gloria Bustamante was appel-

lant. Since there was no sign of forced entry, the jury could reasonably have concluded that the fire was set by one of the occupants of the house. The jury might also have considered the fact that the entire downstairs was devastated with the exception of the room in which appellant kept his personal belongings relevant to establishing the identity of the perpetrator. The jurors heard testimony from fire investigators as to how accelerated fires spread and burn and their theories as to how the fire started, and they also heard testimony from appellant as to what he saw and did in his home, and they were free to accept whatever portions of the testimony and evidence they found credible and reject the rest. The jury was warranted in concluding that appellant spread accelerant from the front door of his home, throughout the first floor to the back door, and ignited the fire from the back doorway and that he then summoned firefighters and made personal attempts to rescue Gloria, whether those attempts were motivated by a desire not to have his involvement discovered or by a genuine panic and regret for the events he had put in motion. There was sufficient circumstantial evidence from which the jury could reasonably have concluded beyond a reasonable doubt that appellant set this fire and thereby knowingly or intentionally killed his wife.

### III. Sentencing

#### A. Consideration of Aggravating Circumstances

Appellant was convicted of murder, which carries a forty-year presumptive sentence, I.C. 35-50-2-3. The trial court made specific findings of aggravators and mitigators, found that the aggravators outweighed the mitigators, and enhanced the presumptive sentence by twenty years. Appellant claims that the trial court misapplied the felony sentencing statute, I.C. 35-38-1-7, in arriving at this sentence.

35-38-1-7(b)(4) states that a sentencing court may consider as an aggravating circumstance that the "[i]mposition of a reduced sentence ... would depreciate the seriousness of the crime," and appellant argues that this factor is applicable only where the trial court is considering imposition of a reduced sentence.[2] Appellant's argument fails because it is based on a preliminary, incorrect assumption that there are circumstances under which the only sentence a judge would consider imposing is a reduced sentence. The presumptive sentence assigned to a given class of felony is the penalty determined by the legislature to be appropriate for the standard crime committed by the standard criminal, in other words, where aggravators and mitigators rest at approximate equipoise. The legislature has also given courts the authority to vary from that presumptive sentence, but to do so, the judge must make specific findings of aggravating and mitigating circumstances, detail why each is considered to be aggravating or mitigating, balance their relative weights to arrive at the decision to impose a reduced or enhanced sentence, and then impose a sentence which falls within a statutorily prescribed range. *Dumbsky v. State* (1987), Ind., 508 N.E.2d 1274. When going about the business of setting a sentence, a judge must, of necessity, consider the entire range of sentencing possibilities, search for and balance aggravators and mitigators, and be open and prepared to either reduce or enhance the standard sentence within the statutory range based on his assessment of the existence of aggravators and mitigators and their relative weights.

Appellant also argues that the seriousness of the crime is a factor already taken into account by the legislature in setting the presumptive sentence and that there-

**2.** This argument has previously been presented to this Court and the Court of Appeals in *Evans v. State* (1986), Ind., 497 N.E.2d 919, and *Wray v. State* (1987), Ind.App., 514 N.E.2d 96. In both of those cases, enhanced sentences were upheld because the language used by the sentencing court indicated that the sentence was based on the court's determination that the imposition of less than an *enhanced* sentence would depreciate the seriousness of the crime. *Evans,* 497 N.E.2d at 923–24; *Wray,* 514 N.E.2d at 96–97. The language used by the trial court here is such that the outcome is not controlled by reference to these two cases.

fore the trial court misapplied I.C. 35–38–1–7 when basing the enhanced sentence upon a finding that a reduced sentence would depreciate the seriousness of the crime. This argument was rejected by this Court in *McNew v. State* (1979), 271 Ind. 214, 391 N.E.2d 607, and need not be further addressed here.

The court's sentencing order stated that one aggravating circumstance was that "great care, caution and planning was used by the Defendant in the commission of the arson, with the intent to kill the victim, Gloria Bustamante, and that the crime was committed purposely, knowingly, and intentionally." Appellant asserts that the trial court wrongfully used an element of the crime as an aggravating circumstance because murder must be a knowing and intentional killing. The court, in its order, is required to explain the reasons for imposing a sentence which is greater or lesser than the standard set by statute. This part of the order particularized the manner in which appellant went about achieving his unlawful purpose and disclosed a basis for the conclusion that he displayed a higher degree of moral culpability which would be deserving of an enhanced sentence.

Appellant also argues that there was no evidence of care and planning in the perpetration of these crimes and contests the validity of considering the planning of a crime as an aggravating circumstance because "[arguably,] any arson, by its very nature, takes some planning." The extensive, strategic placement of the accelerant poured through the downstairs, which blocked all routes of escape from the upstairs, provided ample evidence that the fire and the resulting death of Gloria Bustamante was carefully planned. Further, this Court has held that the planning of an offense can appropriately be considered as an aggravating circumstance. *McCawley v. State* (1980), 274 Ind. 137, 409 N.E.2d 594.

Finally, the trial court found as aggravating circumstances that "the victim was a person with whom the Defendant would have a trusting relationship inas-much as they were husband and wife at the time of the death of Gloria Bustamante" and that "evidence was introduced during the trial that the Defendant would gain financially" as a result of the arson. Appellant does not assert that these were improperly considered by the court to be aggravating circumstances, but rather, that these findings were not supported by the evidence. A review of the record shows that Gloria trusted appellant sufficiently to continue to live with him despite pleas and warnings from her daughter and mother and that she apparently harbored so little fear that he would harm her on the day before her death that she spent the entire day with appellant shopping, preparing the evening meal and ironing his clothes for him, eating and watching television with him, chatting pleasantly with appellant's then-daughter-in-law, and then going up to the bedroom they shared to retire for the night. Appellant argues that evidence that financial gain was the motive for the arson was not substantial and was rebutted by evidence at trial. However, there was uncontested evidence from insurance officials as to appellant's eligibility for life and home insurance policy proceeds as a result of the fire and the respective amounts payable from each policy. There was sufficient evidence to support the court's findings.

The trial court committed no error in its consideration of aggravating circumstances.

### B. Merger of Convictions

The jury returned guilty verdicts against appellant on counts of murder, felony murder, and arson. For the purposes of sentencing, the trial court merged the felony murder into the murder, then imposed concurrent sentences for murder and arson. Appellant argues that the trial court erred in sentencing him on the arson conviction. He is correct. Count I, the murder charge, alleged in pertinent part that appellant "knowingly or intentionally kill[ed] Gloria Bustamante by means of setting a fire." Count III, the arson charge, alleged that appellant

did knowingly or intentionally damage, by means of fire, the property of Arthur J. Bustamante, Sr. and Gloria Bustamante ... under circumstances that endangered human life, to-wit: by setting said fire while Gloria Bustamante was inside said residence, and resulting in serious bodily injury to Gloria Bustamante; All of which is contrary to ... Ind.Code 35–43–1–1(a)....

Indiana Code 35–43–1–1 criminalizes the destruction of property by fire and assesses criminal penalties for such acts, the severity of which depends on the identity of the property owner, the value of the property, the circumstances of or motivation for the crime, and the infliction of injury. It is clear from the charging instrument that appellant was charged under subsection (a)(2) of the arson statute, which provides:

A person who, by means of fire or explosive, knowingly or intentionally damages ... property of any person under circumstances that endanger human life ... commits arson, a Class B felony. However, the offense is a Class A felony if it results in either bodily injury or serious bodily injury to any person other than a defendant.

The focus of this subsection is the protection of human life, not of property. It is the only part of the arson statute in which penalty attaches based solely on the risk or actual infliction of injury and irrespective of whose property is damaged, the value of the property or the motivation of the perpetrator. Under subsection (a)(2), the mere creation of risk of injury by means of fire is a B felony; if that risk is realized, the crime is elevated to an A felony.

In this case, appellant committed murder by means of setting fire to his house, and the sentence imposed on the murder charge punishes him for the fatal injury he inflicted on his wife by that instrumentality. Imposition of an A felony sentence for arson under I.C. 35–43–1–1(a)(2), based on the infliction of serious bodily injury on Gloria Bustamante by means of fire, punishes appellant twice for the same injury. This offends Article 1, § 14 of the Indiana Constitution and the Fifth Amendment of the United States Constitution, which prohibit multiple punishment for the same offense. *King v. State* (1988), Ind., 517 N.E.2d 383; *Bevill v. State* (1985), Ind., 472 N.E.2d 1247. Therefore, the thirty-year sentence imposed by the trial court on the arson count must be vacated.

## *IV. Grand Jury Transcript*

■ Under I.C. 35–34–2–10(b), a transcript of grand jury proceedings may be made available to a criminal defendant upon order of the court trying the case and "only after a showing of particularized need for the transcript." Appellant filed a motion requesting "a transcript of the minutes and of the oral testimony of each witness" of the grand jury proceedings in his cause. He particularized his need of the transcript as follows:

4. A written transcript of the minutes and testimony given at the Grand Jury proceeding is necessary to prepare a proper defense and to conduct a thorough investigation of the charges.

5. A written transcript of the testimony given at the Grand Jury proceeding is necessary for potential use at trial to impeach testimony of the State's witnesses.

The trial court ordered that the testimony of all State grand jury witnesses whom the State intended to call at trial be made available to appellant. He asserts on appeal that the omission of his own testimony before the grand jury from this order was prejudicial.

The court's order fully satisfies appellant's allegation of need set forth in Number 5 of his petition. Even assuming the validity of appellant's assertion that his own grand jury testimony was necessary to investigate the charges and prepare a defense, appellant has waived any alleged error in failure to produce the record of that testimony. The court's order, issued on April 28, 1987, directed that a transcript of the testimony covered by the order be made available to appellant on or before May 5, 1987. Trial began on May 11, 1987. Appellant knew or should have known from

seven to thirteen days before trial that his grand jury testimony was not to be included in the transcript provided to him under the court's order. His failure to ask for a continuance either to clarify that his motion included a request for his own testimony or to contest the court's failure to produce that testimony by its order waived the allegation that its omission prejudiced him. *Dean v. State* (1982), Ind., 432 N.E.2d 40.

### V. Newly Discovered Evidence

 In his motion to correct errors, appellant asserted that he was entitled to a new trial based on the discovery of new evidence. In support of this motion, appellant attached the affidavit of his son, Arthur Bustamante, Jr., which set forth that a privately retained investigator had discovered evidence supporting appellant's claim of innocence and that neither appellant nor his son had been financially able to retain the investigator until after the conclusion of the trial. At a hearing on appellant's motion to correct errors, the son testified that the investigation produced evidence in conflict with State's evidence adduced at trial. Specifically, he testified that the private investigator found a pair of appellant's socks in the upstairs bedroom, the remains of a smoke alarm in the stairway, and an oil lamp in the debris outside the house that appellant said was on the dining room table. He testified that the investigator's opinion was that the State's experts overestimated the amount of accelerant used to start the fire because, again in the investigator's opinion, the ignition of three to five gallons of accelerant would have caused an explosion that would have blown out the ceiling and walls of the house. Bustamante, Jr., also testified that he believed the State's illustration of the burn pattern and theory on the origin of the fire were inaccurate based on his own post-trial examination of the residence.

 To demonstrate entitlement to a new trial, appellant must show that the new evidence

1) has been discovered since the trial;
2) is material and relevant;
3) is not cumulative;
4) is not merely impeaching;
5) is not privileged or incompetent;
6) was not discoverable upon due diligence in time for trial;
7) is worthy of credit;
8) can be produced upon retrial of the cause;
9) will probably produce a different result.

*Francis v. State* (1989), Ind., 544 N.E.2d 1385. The evidence cited above does not meet this standard. Appellant's new evidence is only impeaching of or is cumulative of the evidence produced at trial; it cannot be said that production of this evidence to a jury on retrial would probably produce a different verdict. The new evidence that goes to whether or not appellant was barefoot and whether the oil lamp had been moved and the evidence on the amount of accelerant used could be considered consistent with the jury's conclusion that appellant set the fire. The assessment of Arthur Bustamante, Jr., regarding the burn pattern is, at best, merely impeaching of the testimony of State's witnesses. Evidence of the discovery of the remains of a smoke alarm is cumulative of testimony by defense witnesses that there had been smoke alarms in the house. The trial court did not err in denying appellant's motion.

The convictions and the sentence on the murder count are affirmed. This cause is remanded to the trial court with instructions to vacate the sentence on the arson count.

SHEPARD, C.J., and GIVAN, PIVARNIK and DICKSON, JJ., concur.