**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



ATTORNEY FOR APPELLANT:

**STEVEN E. RIPSTRA**
Ripstra Law Office
Jasper, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**KARL M. SCHARNBERG**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| TIMOTHY J. PADGETT, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 51A01-1305-CR-228 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE MARTIN CIRCUIT COURT
The Honorable Lynne E. Ellis, Judge
Cause No. 51C01-1203-FB-28

**January 21, 2014**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**BROWN, Judge**

Timothy J. Padgett appeals his conviction for burglary as a class B felony. Padgett raises two issues which we revise and restate as:

I.      Whether the court erred in denying Padgett's request for a change of judge; and

II.     Whether the evidence is sufficient to sustain Padgett's conviction.

We affirm.

FACTS AND PROCEDURAL HISTORY

In October 2011, Edward Bullock had some roofing work completed on his house in Loogootee by Huff Construction. Padgett was a member of the crew that performed the work on Bullock's house. The crew stored some items in Bullock's garage and was at Bullock's residence when he went to work in the morning and came home for lunch. At some point, Bullock had a conversation with Padgett in the grocery store where Bullock worked.

On February 14, 2012, Bullock left his home around 7:00 a.m., noticed fresh snow on the ground, and went to work. That same morning, Tom Trambaugh began driving into town at approximately 9:00 or 9:30 a.m., and noticed a blue vehicle with a black front fender parked at the edge of the roadway on Cherry Street which was very unusual. Trambaugh also observed a person walking on Bullock's driveway toward Cherry Street who he later identified as Padgett. Approximately thirty minutes later, Trambaugh saw the vehicle parked at a gas station and Padgett standing outside of the vehicle.

Bullock returned to his home around noon for lunch per his typical schedule. He went to unlock his door and noticed pry marks on both sides of the latch and that the door was partially open. He went into the house and saw that cabinet doors that had been

closed were now open and medicine was missing, and he called the Loogootee Police Department. Loogootee Police Chief Kelly Rick Rayhill arrived at the residence, noticed a footprint on the front sidewalk, and took a picture of the shoe print. Chief Rayhill and Bullock examined footprints in the snow which consisted of only one particular footprint and the footprints went "to the front door, they came back, they went around the house to the back, they came back again and went back to the entry door . . . ." Transcript at 99. Chief Rayhill observed that the shoe prints had a fairly distinctive tread and observed that the door from the garage to the house was torn "from damage which appeared to be from a crowbar." Id. at 140. Bullock saw that pill bottles for prescription medicine and a watch were missing.

That same day, Padgett and his girlfriend Ashley Ingler went to Goodies to purchase new shoes for him because he told her that he had a hole in his shoes. Ingler thought it was odd that Padgett purchased shoes in a smaller size than the shoes that he had. He put his old shoes into a trash can outside of Goodies. Ingler also observed that Padgett was wearing a watch while he did not usually wear one. The watch was loose on Padgett, and he asked Ingler to adjust it for him.

On February 15, 2012, Martin County Sheriff's Deputy Steven Noland stopped a vehicle in which Padgett was riding for a reason unrelated to the burglary, an inventory search of the vehicle was conducted, and the police discovered a crowbar on the passenger rear floorboard. The police also retrieved Padgett's old shoes from a dumpster at Goodies.

3

Approximately two or three weeks later, Keith Greenwell was taking a walk with his wife and found pill bottles that had the names of Bullock and his wife on them. Greenwell called the police and Bullock, and the police picked up the bottles.

On March 23, 2012, the State charged Padgett with burglary as a class B felony in cause number 51C01-1203-FB-28 ("Cause No. 28"). On May 1, 2012, the parties filed a proposed plea agreement in which Padgett agreed to plead guilty as charged in Cause No. 28 as well as to charges in two other cause numbers and admit to a probation violation in another cause. The State agreed to recommend a sentence of ten years in Cause No. 28. On July 10, 2013, the court rejected the plea agreement and it was explained because of Padgett's substantial criminal history, that there was nothing in the plea agreement that Padgett be responsible for the money he owed to the county, the plea agreement called for Padgett to be housed with the local police department instead of the Department of Correction, and the sentence with respect to the probation violation was not legal. The court stated that it would consider other plea agreements.

On July 10, 2012, Padgett filed a verified motion for recusal of judge in cause number 51C01-0811-FD-130 ("Cause No. 130") and cause number 51C01-1202-FD-17 ("Cause No. 17"). The motion alleged that the trial judge's continued involvement created a perception that the judge's ability to carry out her responsibilities with impartiality was impaired. The motion attached Padgett's affidavit in which he alleged that the trial judge rejected his plea agreement, said that she was sick of Padgett, and told the deputy that he needed to remove Padgett from the courtroom.

4

On July 19, 2012, the court held a hearing in cause number 51C01-1203-FB-27 ("Cause No. 27") and Cause Nos. 17, 28, and 130. Padgett's counsel indicated that he wished to add the two counts involving offenses as class B felonies to the written verified motion for recusal. The court denied Padgett's motion for recusal and stated:

> [Y]our client is entitled to a jury trial, that is his constitutional right. The comments made by the Court have nothing to do with his constitutional rights to a trial by jury. Uh, it was, uh, made at a time when a plea agreement, an illegal plea agreement, was presented to the Court and there were situations that if someone would like to know the facts and circumstances, uh, at the initial hearing your client lied to me. And it was just a continuous situation by your client, uh, his lying not once but twice. I see no reason why this Court can not give your client a fair trial and that is what he has a right to.

Id. at 30.

On July 23, 2012, Padgett filed a verified motion for change of judge in Cause Nos. 17, 27, 28, and 130. The motion stated that it was being filed pursuant to Ind. Criminal Rule 12(D)(2), alleged that Padgett appeared in court on May 1, 2012, to present a plea agreement, and referred to his affidavit.

On July 24, 2012, the court entered an order denying Padgett's motion for recusal. The order referenced Padgett's July 23, 2012 filing and stated that such motion was filed solely for the purpose of complying with Criminal Rule 12 procedures and for no other purpose and therefore no hearing was required on the motion.

On August 1, 2012, Padgett filed a request for certification of an order for interlocutory appeal in Cause Nos. 17, 27, 28, and 130. On August 6, 2012, the court denied Padgett's request for certification.

In March 2013, the court held a jury trial in Cause No. 28. During direct examination, Bullock testified that he received his mail at the mailbox at the end of the driveway and did not receive a daily newspaper. He described where the electric meter and water meter were located and said that he did not have anything advertised for sale in the newspaper or by word of mouth. Ingler identified the vehicle pictured in State's Exhibit 15 as belonging to her and said that Padgett was allowed to use her vehicle and routinely did so. She testified that Padgett used her car the morning of February 14, 2012, and that Padgett said he needed new shoes because he had a hole in his. Upon examining the shoes at trial Ingler testified that the shoes did not have holes but had a piece of missing fabric. Trambaugh identified the vehicle pictured in State's Exhibit 15 as the vehicle he saw that day. The jury found Padgett guilty as charged, and the court sentenced Padgett to fourteen years.

## DISCUSSION

## I.

The first issue is whether the court erred in denying Padgett's request for a change of judge. Padgett argues that the trial court "clearly found [him] to be a 'liar' and characterized his lack of veracity as 'a continuous situation.'" Appellant's Brief at 11 (quoting Transcript at 30). He contends that "the prejudice, the jeopardy, is in the effect the court's recriminations have upon [his] inclination to seek, or accept, a plea agreement instead of a trial" and that "[i]f the statements contained in [his] affidavit, certified to by his trial counsel, are accurate, these certainly create, at best, the appearance of impropriety: bias and prejudice." Id. at 11-12. He concludes that "[i]n reality, the facts

6

may be Padgett's fault because he was not truthful, but the facts and the court's reaction still exist." Id. at 12.

The State argues the exchange described by Padgett does not appear anywhere in the transcript of the hearing and that Padgett did not avail himself of the procedure set forth in Appellate Rule 31 to supply the deficiency in the transcribed record. The State also argues that there is no reason to conclude that the trial judge held any personal bias against Padgett and points out that the record does not disclose the context in which the court's alleged statements were made or what else may have been happening in the courtroom.

> Ind. Criminal Rule 12(B) provides:
>
> In felony and misdemeanor cases, the state or defendant may request a change of judge for bias or prejudice. The party shall timely file an affidavit that the judge has a personal bias or prejudice against the state or defendant. The affidavit shall state the facts and the reasons for the belief that such bias or prejudice exists, and shall be accompanied by a certificate from the attorney of record that the attorney in good faith believes that the historical facts recited in the affidavit are true. The request shall be granted if the historical facts recited in the affidavit support a rational inference of bias or prejudice.

"Adjudicating a request for change of judge based on Rule 12(B) requires an objective, not subjective, legal determination by the judge, who is 'to examine the affidavit, treat the facts recited in the affidavit as true, and determine whether these facts support a rational inference of bias or prejudice.'" Voss v. State, 856 N.E.2d 1211, 1216 (Ind. 2006) (quoting Sturgeon v. State, 719 N.E.2d 1173, 1181 (Ind. 1999)). A party is entitled to a change of judge only if the historical facts recited in the affidavit support a rational inference of bias or prejudice. Id. This is not limited to cases in which the judge has

7

expressed an opinion on guilt or innocence or the merits of the case. Id. It does not depend on a subjective showing that the trial judge is actually biased or prejudiced. Id. In considering a motion for change of judge, the challenged judge's ruling does not depend upon a self-assessment of actual bias or prejudice. Id. The judge must instead determine whether the historical facts presented in support of the motion lead to a rational inference of bias or prejudice. Id. A change of judge is neither automatic nor discretionary, but rather requires the trial judge to make a legal determination, not a self-analysis, of actual bias or prejudice. Id. Adverse rulings and findings by a trial judge from past proceedings with respect to a particular party are generally not sufficient reasons to believe the judge has a personal bias or prejudice. Id. at 1217. The mere assertion that certain adverse rulings by a judge constitute bias and prejudice does not establish the requisite showing. Id.

"The law presumes that the judge is unbiased and unprejudiced." Buggs v. State, 844 N.E.2d 195, 205 (Ind. Ct. App. 2006) (citing Garland v. State, 788 N.E.2d 425, 432 (Ind. 2003)), reh'g denied, trans. denied. Exposure to evidence through judicial sources is not, by itself, sufficient to establish bias. Sturgeon, 719 N.E.2d at 1182. Nor is rejection of a plea agreement. Haynes v. State, 656 N.E.2d 505, 508 (Ind. Ct. App. 1995). Upon appeal, we review the trial court's decision on a motion for change of judge for clear error, reversing only when our review of the record "leaves us with a definite and firm conviction that a mistake has been made." Noble v. State, 725 N.E.2d 842, 848 (Ind. 2000).

In his petition, Padgett averred:

That I appeared in Court for presentation of my plea on May 1, 2012. On that date the Court began reciting the terms of my plea. When the Court came to that portion of the plea that stated that I could serve my time in the Martin County Jail, the Court became upset and my attorney and the deputy prosecutor approached the bench. After they returned to the tables the Court stated that it was "sick of this client and sick of this case". The Judge immediately left the Court room without making further record.

The Judge then returned to the bench to take up other matters and another defendant was called to the table. I was seated back where the inmates are kept, but I could still be seen by the Judge. The Judge then told Deputy Tony Dant that "he needed to get me out of the Courtroom". During this entire process I did not know what was happening because the Judge did not make any more record in my case. There were lots of other people in Court and the Judge raised her voice very loudly when she made these statements.

A few days later I received notice by docket sheet that the Court had rejected my plea. I signed a paper in Court that had one date and then the docket sheet had a different date. My case was rescheduled a few more times until we finally came to Court on July 2, 2012, when I was again advised that the Court would not accept my plea, but no record was made at that time because of problems with the recording equipment.

Appellant's Appendix at 40.

To the extent that Padgett may rely upon the rejection of the plea agreement, we observe that rejection of a plea agreement is not by itself sufficient to establish bias. Haynes, 656 N.E.2d at 508. Further, the record reveals that the trial court rejected the plea agreement because of Padgett's substantial criminal history, that there was nothing in the plea agreement that Padgett be responsible for the money he owed to the county, and the plea agreement called for Padgett to be housed in the county jail instead of the Department of Correction. The court further referred to the sentence with respect to the probation violation as illegal. Padgett does not argue that the bases for rejecting the plea

9

agreement were improper. We also observe that after rejecting the plea agreement, the court stated:

> Uh, in chambers I did advise counsel that if they wanted to bring something to me that was, uh, concluded at DOC, uh, incarceration that I would consider that plea agreement. I also advised counsel that if, if the defendant was willing to serve his full time on his probation violation that I was willing to wipe away the Eighteen Hundred Dollars ($1800.00) or at least consider that. But I don't negotiate plea agreements. I advise counsel what I am willing to accept and I am not willing to accept the plea agreement as written on this gentleman. Uh, I think if you go back to the initial hearing this gentleman was given a great opportunity. He advised the Court that he was working and he would be paying for his counsel. And, uh, he lied to the Court. But my reason for rejection has two bases, number one that is unheard of to, to commit someone to a local jail on two B felonies, and number two, seventy-seven (77) days credit on the probation violation is against statute and can not be accepted by this Court.

Transcript at 21.

As pointed out by the State, Padgett concedes that "[i]n reality, the facts may be Padgett's fault because he was not truthful . . . ." Appellant's Brief at 12. Further, as pointed out by the State, the record does not reveal the context surrounding the trial judge's alleged request to remove Padgett from the courtroom. Under the circumstances, we cannot say that clear error exists or that we are left with a definite and firm conviction that a mistake has been made.

## II.

The next issue is whether the evidence is sufficient to sustain Padgett's conviction for burglary as a class B felony. When reviewing claims of insufficiency of the evidence, we do not reweigh the evidence or judge the credibility of witnesses. Jordan v. State, 656 N.E.2d 816, 817 (Ind. 1995), reh'g denied. Rather, we look to the evidence and the reasonable inferences therefrom that support the verdict. Id. We will affirm the

conviction if there exists evidence of probative value from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. Id. It is well established that circumstantial evidence will be deemed sufficient if inferences may reasonably be drawn that enable the trier of fact to find the defendant guilty beyond a reasonable doubt. Pratt v. State, 744 N.E.2d 434, 437 (Ind. 2001).

Mere presence at the crime scene with the opportunity to commit a crime is not a sufficient basis on which to support a conviction. Id. at 436. However, presence at the scene in connection with other circumstances tending to show participation, such as companionship with the one engaged in the crime, and the course of conduct of the defendant before, during, and after the offense, may raise a reasonable inference of guilt. Id.; Maul v. State, 731 N.E.2d 438, 439 (Ind. 2000).

Identification testimony need not necessarily be unequivocal to sustain a conviction. Heeter v. State, 661 N.E.2d 612, 616 (Ind. Ct. App. 1996). Elements of offenses and identity may be established entirely by circumstantial evidence and the logical inferences drawn therefrom. Bustamante v. State, 557 N.E.2d 1313, 1317 (Ind. 1990). As with other sufficiency matters, we will not weigh the evidence or resolve questions of credibility when determining whether the identification evidence is sufficient to sustain a conviction. Id. Rather, we examine the evidence and the reasonable inferences therefrom that support the conviction. Id.

Ind. Code § 35-43-2-1 provides that "[a] person who breaks and enters the building or structure of another person, with intent to commit a felony in it, commits burglary, a Class C felony. However, the offense is . . . a Class B felony if . . . the

11

building or structure is a . . . dwelling . . . ." Thus, the State was required to prove beyond a reasonable doubt that Padgett broke and entered Bullock's dwelling with the intent to commit a felony in it.

Padgett argues that there is no evidence that he was in the house or touched any of the missing items, and that the footprints may have belonged to another person or perhaps were made by Padgett for a legitimate reason such as searching for help after having car trouble. He contends that the essential elements of this crime were not proven beyond a reasonable doubt. The State argues that the evidence points to the conclusion that Padgett did not have any car trouble because he was later seen fueling the vehicle in town and was later driving the vehicle, and that it was reasonable for the jury to conclude that he was the person who burglarized Bullock's home.

To the extent that Padgett appears to argue that the essential elements of breaking and entering were not proven beyond a reasonable doubt, we observe that Bullock noticed pry marks on both sides of the latch on his door and that the door would not close because the latch "had been messed up on the door." Transcript at 97. The State also introduced pictures of the damaged door frame. Further, Bullock testified that he did not give anyone permission to enter his residence that day.

On the day of the burglary which included theft of Bullock's watch, Padgett threw out his shoes, purchased new shoes, and was wearing a watch which was loose on him and which was unusual because Padgett did not typically wear a watch. Further, Chief Rayhill observed that the door from the garage to the house was torn from damage which

12

appeared to be from a crowbar, and when Padgett was stopped by police the day after the burglary he had a crowbar on the passenger rear floorboard.

With respect to the identification, the evidence contains a photograph of a footprint in the snow and a photograph of the soles of the shoes that Padgett threw into a trash can the same day as the burglary. Trambaugh testified that he saw Padgett walking on Bullock's property on the morning that Bullock's residence was burglarized. During the direct examination of Trambaugh, the following exchange occurred:

Q      Uh, did you have any trouble seeing him?

A      No, I did not.

Q      Any question that this was him?

A      No, there is not.

Id. at 187.

While the jury could have made different inferences from the evidence, we cannot say that the inferences made by the jury here were unreasonable. Based upon our review of the evidence and testimony most favorable to the conviction as set forth in the record and above, we conclude that sufficient evidence exists from which the trier of fact could find Padgett guilty beyond a reasonable doubt of burglary as a class B felony.

## CONCLUSION

For the foregoing reasons, we affirm Padgett's conviction and sentence for burglary as a class B felony.

Affirmed.

ROBB, J., and BARNES, J., concur.

13