## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Mar 20 2015, 7:18 am

CLERK
of the supreme court,
court of appeals and
tax court

| ATTORNEY FOR APPELLANT | ATTORNEYS FOR APPELLEE |
|---|---|
| Donald C. Swanson, Jr.<br>Fort Wayne, Indiana | Gregory F. Zoeller<br>Attorney General of Indiana |
| | Karl M. Scharnberg<br>Deputy Attorney General<br>Indianapolis, Indiana |

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Senaca V. Lapsley,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff.* | March 20, 2015<br><br>Court of Appeals Case No. 02A05-1408-CR-399<br><br>Appeal from the Allen Superior Court<br><br>The Honorable Frances C. Gull, Judge<br><br>Cause No. 02D05-1312-FB-247 |

**Brown, Judge.**

[1] Senaca V. Lapsley appeals his convictions and sentence for two counts of aggravated battery as class B felonies and criminal recklessness as a class C felony. Lapsley raises two issues, which we revise and restate as:

I. Whether the evidence is sufficient to sustain his convictions; and

II. Whether his sentence is inappropriate in light of the nature of the offense and the character of the offender.

We affirm.

## Facts and Procedural History

[2] At around 12:00 a.m. on December 25, 2013, Lapsley asked his girlfriend, Tequila James, if she would drop him off to see his brother at Stein Tavern. James saw that Lapsley had a pistol "on the side of his jacket and the pants pocket." Transcript at 107. James dropped Lapsley off at Stein Tavern and drove away.

[3] At approximately 1:00 a.m. on December 25, 2013, Lapsley, who had dreadlocks, his brother Lorenzo, and another man entered Sports and Spirits, a tavern in Fort Wayne, Indiana. There were around fifty people at the bar. Randy Daniels was working as a doorman at the bar, and Anna Roque and Zachary Huddleston, both of whom worked as bartenders but were not working at the time, were socializing with Daniels. At some point, Lorenzo punched a man in the face, and Daniels rushed over to break up the fight. Daniels attempted to defuse the situation and, with the help of Huddleston, directed

Lapsley, Lorenzo, and the third man toward the door. Daniels, with Huddleston's assistance, forced the three men to exit the bar through the front door, and Daniels locked the door.

[4] Within seconds after he exited the building, Lapsley pulled a gun out of his clothing, pointed it directly through the front window of the bar, and fired the gun multiple times. Roque was struck in the hand, and Huddleston was struck in the neck and abdomen. A bullet entered Huddleston's neck below his chin and exited out of his jaw, shattering it. A second bullet entered Huddleston's abdomen, traveled through his bladder, and struck the femoral artery in his left leg. Huddleston tried to scream but could not because of the blood in his throat. Roque helped Huddleston roll over so that he could cough so that he would not choke on his own blood. A part of one of Roque's fingers later had to be amputated as a result of her injuries. Huddleston later underwent approximately ten operations during three hospital stays totaling about two months.

[5] In the morning following the shooting, Lapsley told James that Lorenzo had "knocked out somebody" at Sports and Spirits. Transcript at 112. Later that night, Lapsley and James were watching the news, and there was a report about the shooting at Sports and Spirits. When the report showed a picture of the window of Sports and Spirits with bullet holes in it, Lapsley yelled: "Damn, that look like my holes I put through the windows." *Id.*

[6] On December 27, 2013, the State charged Lapsley with two counts of aggravated battery as class B felonies and three counts of criminal recklessness as class C felonies. The State later alleged Lapsley was an habitual offender. A two-day jury trial was held in July 2014, at which the jury heard the testimony of, among others, Daniels, Roque, Huddleston, James, and Fort Wayne Police Detective Edward Sabo. Roque and Daniels made in-court identifications of Lapsley, Detective Sabo testified that Roque identified Lapsley in a photo array, and James testified regarding seeing Lapsley with a gun prior to the shooting and his statements following the shooting. The jury found Lapsley guilty as charged and found him to be an habitual offender. Following a sentencing hearing, at which the court found no mitigating factors and Lapsley's criminal history and failed prior attempts at rehabilitation to be aggravating factors, the court sentenced him to twenty years for each of the aggravated battery convictions and eight years for one criminal recklessness conviction. The court vacated two of the convictions for criminal recklessness due to double jeopardy concerns, ordered that Lapsley serve his sentences consecutively, and enhanced the sentence for one of the aggravated battery convictions by thirty years due to the habitual offender finding, for an aggregate term of seventy-eight years.

## Discussion

### I.

[7] The first issue is whether the evidence is sufficient to sustain Lapsley's convictions. When reviewing claims of insufficiency of the evidence, we do not

reweigh the evidence or judge the credibility of witnesses. *Jordan v. State,* 656 N.E.2d 816, 817 (Ind. 1995), *reh'g denied.* Rather, we look to the evidence and the reasonable inferences therefrom that support the verdict. *Id.* We will affirm the conviction if there exists evidence of probative value from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. *Id.*

[8] Lapsley contends the State presented insufficient evidence to convict him. He argues that, with no physical evidence linking him to the shooting, the State's case rises and falls on the sufficiency of the identifications given by Daniels and Roque. He argues that the inherent problems in eyewitness testimony are well known and that "[i]t is likely no exaggeration to state that, within our collective lifetimes, the current use of eye witness testimony alone to support a criminal conviction will be viewed as having similar validity as the methods used for determining the guilt of accused witches in 17th Century Salem." Appellant's Brief at 6-7. He argues that "[t]his Court is left with two cross-racial identifications, made on the basis of memories formed during a high-stress, and extremely short, period of time." Appellant's Brief at 7. Specifically, Lapsley argues that Daniels's identification "was some seven (7) months after the incident" and in direct contradiction to his inability to identify any suspect on the day of the incident. *Id.* He asserts that Roque's identifications "are even more suspect" as she was under the influence of alcohol at the time and identified Lapsley on the date of the incident as someone other than the shooter. *Id.* Lapsley further argues that, while James's testimony places

Lapsley in possession of a handgun and in similar clothes as the shooter, James could not testify that Lapsley was at Sports and Spirits on the night of the shooting.

[9] The State maintains that two people identified Lapsley as the person who fired a gun into the bar, and the entire episode was captured on video from multiple angles leaving little question Lapsley was properly identified as the shooter. The State argues that Roque testified she knew Lapsley and his brother Lorenzo personally and that Roque identified Lapsley in a video by his clothing and hair. The State notes there was a discrepancy between Roque's testimony and the report of Detective Sabo, that Roque's trial testimony and identification of Lapsley from a photo array were unequivocal, and whatever weight the jury assigned to the discrepancy appears to have been resolved by the jury in Roque's favor. The State further argues that Daniels was unequivocal in identifying Lapsley as the person in a photograph admitted as State's Exhibit 2 as the person closest to the door, that the photograph shows Lapsley standing nearest the door, and that the same man is shown firing the gun in the video from outside the door. The State also argues that Lapsley admitted to James that he and Lorenzo went to Sports and Spirits and that Lorenzo had struck someone while there, that James had seen a gun on Lapsley earlier in the evening, and that Lapsley's comment to James during news coverage of the shooting corroborates that Lapsley was responsible for the bullet holes in the window of the bar.

[10] Elements of offenses and identity may be established entirely by circumstantial evidence and the logical inferences drawn therefrom. *Bustamante v. State,* 557 N.E.2d 1313, 1317 (Ind. 1990). The unequivocal identification of the defendant by a witness in court, despite discrepancies between his description of the perpetrator and the appearance of the defendant, is sufficient to support a conviction. *Emerson v. State,* 724 N.E.2d 605, 610 (Ind. 2000), *reh'g denied.* Identification testimony need not necessarily be unequivocal to sustain a conviction. *Heeter v. State,* 661 N.E.2d 612, 616 (Ind. Ct. App. 1996). Inconsistencies in identification testimony impact only the weight of that testimony, because it is the jury's task to weigh the evidence and determine the credibility of the witnesses. *Gleaves v. State,* 859 N.E.2d 766, 770 (Ind. Ct. App. 2007) (citing *Badelle v. State,* 754 N.E.2d 510 (Ind. Ct. App. 2001), *trans. denied*). As with other sufficiency matters, we will not weigh the evidence or resolve questions of credibility when determining whether the identification evidence is sufficient to sustain a conviction. *Id.* Rather, we examine the evidence and the reasonable inferences therefrom that support the verdict. *Id.*

[11] Roque testified that she recognized and knew Lapsley and Lorenzo, identified Lorenzo as the person wearing a fur coat, and identified Lapsley in a video admitted into evidence as the person who was wearing a white t-shirt, grey sweatshirt or coat, and a dark skullcap and whose hair was in dreadlocks. Roque also identified Lapsley in court and testified that she had identified him to police in a photo array, and the photograph with her initials was admitted into evidence as State's Exhibit 3. **(Tr. at 71, 76; State's Exhibit 3)** The State

presented three video recordings, admitted into evidence as State's Exhibit 1, which together showed footage of the shooting and the activities in the bar before and after the shooting. One of the recordings shows a man in a fur coat and identified by Roque as Lorenzo punch another person, and the man identified as Lapsley by Roque is shown standing with the man in the fur coat. Another of the video recordings shows the area outside the door of the bar and clearly shows the person identified as Lapsley by Roque firing a gun multiple times toward the building moments after he had exited the building. On cross-examination, defense counsel asked Roque if she had indicated to Detective Sabo that the same person with the fur coat and fuzzy hat had dreadlocks, and Roque said no and that she told Detective Sabo that Lorenzo was the person wearing the fur coat. When asked if she, by chance, identified Lorenzo as being Lapsley, Roque answered no. Detective Sabo testified that, according to his report, when Roque gave him a description of the possible suspects, she described the individual as a black male with dreadlocks and that she believed the person was wearing a fur coat. In addition, Detective Sabo testified that Roque was able to positively identify Lapsley from a photo array, and the photograph was admitted into evidence.

[12] Daniels identified Lapsley as the person in a photograph admitted as State's Exhibit 2 as the person positioned closest to the door of the bar. The photograph depicts a man standing near the bar door wearing a white t-shirt, a dark sweatshirt or coat, and a dark hat or cap. The man identified by Daniels as Lapsley in the photograph is the man shown in the video recording admitted

into evidence firing a gun multiple times towards the bar window. Daniels testified that he "was a real basket case" immediately following the shooting and was not able to identify the suspects at the time. Transcript at 45. Daniels unequivocally identified Lapsley in court as the person who was positioned closest to the door of the bar in the photograph admitted as State's Exhibit 2.

[13] James testified that, prior to dropping Lapsley off at Stein Tavern, she had noticed that Lapsley possessed a gun. She also testified that, in the morning following the shooting, Lapsley told her that Lorenzo had "knocked out somebody" at Sports and Spirits and that, later in the evening when watching a news report showing the window of Sports and Spirits, Lapsley stated "that looks like my holes I put through the windows." *Id.* at 112.

[14] The jury heard testimony from Roque, Daniels, and James as set forth in part above, and each of them were examined before the jury regarding their observations. The three video recordings depicting the shooting and the actions of the persons described as Lapsley and Lorenzo by Roque and Daniels were also admitted into evidence. The jury was able to assess the credibility of each of the witnesses in light of his or her own testimony and in light of the testimony of the other witnesses. To the extent there was any discrepancy between Detective Sabo's report regarding a description given by Roque and Roque's subsequent positive photo identification and in-court identification of Lapsley, or between Daniels's initial failure to make a positive identification of the suspects and his subsequent unequivocal in-court identification of Lapsley, it was the jury's function to resolve any such conflicting testimony and

discrepancies. *See Emerson,* 724 N.E.2d at 610 (observing that it is the jury's function to resolve conflicting testimony and discrepancies between the witnesses' original out-of-court identifications); *Gleaves,* 859 N.E.2d at 770 (observing that discrepancies were factual issues for the jury to resolve). Roque described Lapsley's clothing and appearance at the bar, identified him in a photo array, and identified him in court; Daniels identified Lapsley in a photograph as the person positioned closest to the bar door and identified him in court; and the person identified as Lapsley by Roque and Daniels is shown shooting through the bar's window in the video recording admitted into evidence. Lapsley's arguments regarding why the witnesses or certain testimony of the witnesses should not be believed amount to an invitation that we reweigh the evidence, which we cannot do. *See Jordan*, 656 N.E.2d at 817. It was reasonable for the jury to infer based upon the evidence presented that Lapsley was the person who performed the acts for which he was charged and convicted.

[15] Based upon our review of the evidence as set forth in the record and above, we conclude that sufficient evidence exists from which the jury could find Lapsley guilty beyond a reasonable doubt of the aggravated battery and criminal confinement counts as charged. *See Wilder v. State,* 716 N.E.2d 403, 405 (Ind. 1999) (noting that it is the duty of the fact-finder to assess the credibility of witness testimony and finding that the State presented evidence of the defendant's identity as the perpetrator involved in the offense).

[16] The next issue is whether Lapsley's sentence is inappropriate in light of the nature of the offense and his character. Indiana Appellate Rule 7(B) provides that this court "may revise a sentence authorized by statute if, after due consideration of the trial court's decision, [we find] that the sentence is inappropriate in light of the nature of the offense and the character of the offender." Under this rule, the burden is on the defendant to persuade the appellate court that his or her sentence is inappropriate. *Childress v. State,* 848 N.E.2d 1073, 1080 (Ind. 2006).

[17] Lapsley acknowledges that the severity of the injuries to Huddleston and Roque cannot be disputed, nor can he minimize his extensive criminal history, but he argues "the sentence handed down by the trial court amounts to a life sentence" and that "[g]iven the fact that Lapsley's convictions rest almost entirely on evidence which is of questionable reliability, Lapsley would submit that such a severe punishment is unwarranted." Appellant's Brief at 9. He requests this court to revise his sentence to the advisory sentence and order that the sentences be served concurrently.

[18] The State argues that Lapsley's sentence is not inappropriate and that he waived his argument as to an appropriateness claim because he failed to make cogent argument regarding the nature of the offense and his character. The State asserts that only the prompt and effective field treatment of Huddleston's wounds by Trooper Anderson prevented this from being a murder case, and

notes that the trial court described the offense as being horrific and stated that the fact someone did not die is remarkable. The State argues that there were about fifty people in the bar on the night Lapsley fired his gun nine times through the window, that he shot into the bar because he had been thrown out earlier, and that he committed a horribly violent act over a trivial matter in which he was the party in the wrong. The State further notes Lapsley's criminal history, including fifteen misdemeanor and five felony convictions and that he was on probation at the time of this offense. The State also argues Lapsley "snorted" when the court stated it was remarkable that nobody died, making it clear he has no remorse for his actions. Appellee's Brief at 13.

[19] Our review of the nature of the offense reveals that, after he had been thrown out of a bar for fighting, Lapsley turned around and fired his gun multiple times into the bar through the window, which resulted in serious injuries to Huddleston and Roque and could have resulted in serious injury or death to many others. At sentencing, the court stated:

> It's horrific what you did, Mr. Lapsley, it's horrific. The fact that people didn't die is remarkable. You can sit there and snort at me all you want, sir, I watched the videotape that twelve (12) jurors watched, as well, and saw you . . . casually pull out a weapon as you would pull out your billfold and fire into that building that was packed with people. And the scary thing about it, Mr. Lapsley, is you couldn't care less.

Sentencing Transcript at 14. The nature of the offense does not warrant a reduction of Lapsley's sentence.

Our review of the character of the offender reveals that, according to the information presented at the sentencing hearing, Lapsley's criminal history includes three juvenile delinquency adjudications, fifteen misdemeanor convictions, and five prior felony convictions. His prior felonies include convictions for possession of cocaine or narcotic drug as a class D felony in 2002, forgery as a class C felony and possession of cocaine as a class D felony in 2005, and failure to return to lawful detention, a class D felony, in 2008. His misdemeanors include convictions for resisting law enforcement, public intoxication, false informing, operating while intoxicated, domestic battery, possession of marijuana, and invasion of privacy. He has had sentences modified four times and his probation revoked four times. The sentencing transcript reveals that the court noted that Lapsley "snorted" and that he "couldn't care less." *Id.* Lapsley's character does not merit a reduction of his sentence.

After due consideration, we conclude that Lapsley has not sustained his burden of establishing that his sentence is inappropriate in light of the nature of the offense and his character.

## Conclusion

For the foregoing reasons, we affirm Lapsley's convictions and sentence for two counts of aggravated battery as class B felonies and criminal confinement as a class C felony.

Affirmed.

Bailey, J., and Robb, J., concur.