## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jun 17 2020, 8:21 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Ryan P. Dillon
Dillon Legal Group, P.C.
Franklin, Indiana

ATTORNEY FOR APPELLEE

Josiah Swinney
Deputy Attorney General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Joshua R. Eldridge, <br> *Appellant-Defendant*, <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff*. | June 17, 2020 <br><br> Court of Appeals Case No. <br> 19A-CR-2564 <br><br> Appeal from the Morgan Superior Court <br><br> The Honorable Brian Williams, Judge <br><br> Trial Court Cause No. <br> 55D02-1807-F2-1041 |

**Brown, Judge.**

[1] Joshua R. Eldridge appeals his convictions for dealing in methamphetamine as a level 2 felony, possession of methamphetamine as a level 3 felony, possession of a narcotic drug as a level 4 felony, possession of a narcotic drug as a level 5 felony, maintaining a common nuisance, a level 6 felony, unlawful possession of a syringe, a level 6 felony, possession of marijuana as a class B misdemeanor, and possession of paraphernalia as a class C misdemeanor. He raises five issues which we restate as:

  I.    Whether the trial court abused its discretion in denying his motion for mistrial;

  II.   Whether the court abused its discretion by admitting certain evidence;

  III.  Whether the prosecutor committed misconduct during closing argument which resulted in fundamental error;

  IV.   Whether the court erred in refusing his proposed jury instructions; and

  V.    Whether the evidence was sufficient to sustain his convictions.

We affirm.

## Facts and Procedural History

[2] At approximately 3:00 p.m. on July 2, 2018, Morgan County Sheriff's Officers Cody St. John and Timothy Coryell, along with two other officers, executed a search warrant with respect to a shed which was located behind a residence on the 600 block of North Main Street in Martinsville, Indiana. The shed carried the same address as the residence, was being used as a living quarters, and had a solid door with a door handle and a key pad that led to a single room containing a rug, a television, an air conditioning unit, a refrigerator, electricity, and drop ceiling with moveable panels. The shed was located 245 feet from North School,

where the Metropolitan School District of Martinsville conducted Martinsville Head Start. Eldridge had lived in the shed for "about three or four years," and his girlfriend, Kayla Poore, "was there a lot." *Id.* at 201, 209.

[3] When the officers arrived, Eldridge stood "just outside the shed" on its east side and Poore sat inside with a friend. *Id.* at 41. After officers secured the three individuals, one officer stayed with them while the others conducted the search. The search uncovered a wallet with a driver's license and a healthcare card belonging to Eldridge. Eldridge's driver's license lists the address of the residence behind which the shed was located. Two other wallets were discovered, and each contained an identification card – one belonging to Poore and the other belonging to the third individual – that listed home addresses that were not the Martinsville address associated with the shed. Officers found a black pouch next to the couch with at least one set of digital scales in it and a needle box, or "sharps container," that was on the floor in sight. *Id.* at 94. They found a bag containing .11 grams of buprenorphine inside a cabinet along the south wall and a box of sandwich bags in the southeast corner of the room.

[4] A crowd gathered outside during this time, officers removed Eldridge, Poore, and the third individual from the scene, and Eldridge's photograph was taken. At some point, John Nail, who lived in another outbuilding on the same lot, approached and gave officers a hint as to "the places to look," including above a corner cabinet with a gap between the drop ceiling and the cabinet's top. *Id.* at 199. The officers lifted the tile and located two black pouches, one of which contained 134.75 grams of methamphetamine while the other contained 7.35

grams of heroin, spoons, syringes, and cotton ball ends. Officers also uncovered inside a false wall outlet five clear plastic bags containing a green leafy substance believed to be marijuana and a glass pipe of the size that would be used to ingest or smoke marijuana.

[5] On July 3rd, officers conducted a secondary search pursuant to a warrant on a vehicle and a "newer" Suzuki motorcycle for which Eldridge held title. *Id.* at 108. The vehicle, which had previously belonged to Eldridge's grandmother and which was titled to Poore, contained in the trunk a black backpack with: several packages of unopened syringes, each package containing approximately ten syringes; EBT and other cards with Eldridge's name; a firearm box, firearm, and unused ammunition; and a box that contained two Naloxone kits.[1]

[6] On July 3, 2018, the State charged Eldridge with dealing in methamphetamine as a level 2 felony, possession of methamphetamine as a level 3 felony, possession of a narcotic drug as a level 4 felony, possession of a narcotic drug as a level 5 felony, possession of cocaine as a level 6 felony, maintaining a common nuisance, a level 6 felony, unlawful possession of a syringe, a level 6 felony, possession of marijuana as a class B misdemeanor, and possession of paraphernalia as a class C misdemeanor. Before trial, the State moved to dismiss the possession of cocaine count.

---

[1] Officer St. John explained that Naloxone is referred to as Narcan and is a medication that can be administered to people who are overdosing.

[7] On August 16, 2019, Eldridge filed a motion in limine requesting that the court preclude the introduction of evidence of Eldridge's other alleged misconduct, based upon Ind. Evidence Rule 404(b).

[8] On August 20, 2019, a two-day jury trial began, and Eldridge was not present. Following voir dire, the court instructed the jury on the following: the State would need to prove beyond a reasonable doubt Eldridge possessed methamphetamine with intent to deliver for the jury to find him guilty of dealing in methamphetamine; they were the exclusive judges of the evidence "which may be either witness testimony or exhibits"; it may strike evidence from the record that they "must not consider" in making their decision; their "verdict should be based only on the evidence admitted and the instructions on the law"; they "must decide the facts from your memory of the testimony and exhibits admitted for your consideration"; and that the attorneys would present opening statements and final arguments, which were not evidence, and were allowed to characterize evidence and attempt to persuade the jurors with arguments that they could accept or reject as they saw fit. *Id.* at 27-28. The court further instructed the jury on the concept of possession. During the prosecutor's opening statement, he stated that none of what he was saying "is evidence itself, rather, I am just trying to convey to you what we expect the evidence to show." *Id.* at 31. During Eldridge's opening statement, defense counsel urged jurors to pay attention to where items were found in relation to where Eldridge was found and then stated: "Or what he might have been able to know." *Id.* at 37. He also

stated that there would be "some evidence of some things that were found where there were no . . . nothing illegal about it, no contraband found." *Id.* at 38.

[9] The court admitted a photograph of Eldridge taken on July 2, 2018, and Officers St. John and Coryell testified that it accurately portrayed his appearance the day of the search.[2] Officer St. John testified about various photographs taken during the investigation, including State's Exhibit 21, a picture of a wallet with an Indiana Operator's License bearing a profile picture, Eldridge's name, the Martinsville address on the 600 block of North Main Street, and Eldridge's driver's license number. During cross-examination, defense counsel asked if the officer had taken any "wide shots" of the interior of the shed, and Officer St. John answered affirmatively and indicated, in response to a question about contraband, that most of it was hidden, or in a shelf, or cabinet, or some things were in the hidden electrical outlet. During redirect examination, he stated that the value of the bag of the suspected methamphetamine would be "several hundred dollars, if not into the thousands worth." *Id.* at 76.

[10] Officer Coryell testified that a gram of methamphetamine typically had a street value of between sixty and eighty dollars and that the average user used about a quarter of a gram a day depending upon his habit. He answered affirmatively

---

[2] Specifically, during redirect examination the prosecutor showed "again what was previously offered as State's Exhibit 41" to Officer St. John and asked if it was an "accurate representation of what the defendant looked like on July 2nd, when you executed the search warrant," and Officer St. John stated, "It is." Transcript Volume II at 79. When the prosecutor handed the photograph to Officer Coryell, he answered: "That's Joshua Ryan Eldridge." *Id.* at 89.

when asked if Eldridge operated the vehicle on a previous occasion and if Eldridge "said it was his grandma's car, and in fact that came back to his grandma." *Id.* at 106. He indicated he had not seen anyone besides Eldridge operating the vehicle, that he checked the status of Poore's driver's license, and that she "was valid on an ID card only" and did not have an Indiana Operator's License.[3] *Id.* at 107. At some point during the redirect examination of Officer Coryell, defense counsel moved outside the presence of the jury for a mistrial based upon potential *Brady* violations[4] arguing he had not been provided with the additional wide shot photographs of the shed's interior about which Officer St. John had testified, that due to the large number of photos received, he "simply believed that there were no additional photos," and that he believed the photographs could lead to potential exculpatory evidence, "as a large part of this case is what was visible, what was not visible." *Id.* at 128. The prosecutor responded that there were not any additional photographs and the State could not give what it did not have "and apparently [it] never had." *Id.* at 129. The court denied Eldridge's motion, stated it did not find the evidence prejudicial enough to declare a mistrial, and indicated defense counsel could cross-examine the witnesses about the wide-shots. Officer St. John was recalled, Eldridge's counsel cross-examined him in the jury's presence, and he answered affirmatively when asked if a photo of "items that were found in the living space" had not been

---

[3] The question mark at the end of Officer Coryell's response seems to be a scrivener's error. *See* Transcript Volume II at 107 ("She did not have an Indiana Operator's License?").

[4] *See Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194 (1963).

presented. *Id.* at 151. When asked what happened to those photos, he stated: "I'm not sure if they didn't get uploaded" and "[s]ince my departure, those computers have been replaced." *Id.* at 152. Later, Eldridge renewed his motion for a mistrial which the court denied.

[11] At the beginning of Nail's testimony, Eldridge objected that Nail would present evidence contrary to Ind. Evid. Rule 404(b), and the court indicated it would incorporate Eldridge's pretrial objections and its ruling. During direct examination, Nail identified Eldridge when shown the July 2, 2018 photograph of him and answered affirmatively when asked if he was certain the photograph was of Eldridge. He answered in the negative when asked if he had ever bought drugs from Poore or her friend and stated, "[y]eah, a few times," when asked if he ever saw Eldridge sell dope to anybody else. *Id.* at 198. He answered affirmatively when asked if he had meant more than three times, and he testified he purchased meth and heroin, in an alternating manner, probably three times a week. When asked if he bought from Eldridge "a hundred times, three times a week for a year," he stated, "Yeah, I'd say that, yeah." *Id.* He indicated he bought in Eldridge's house when he bought drugs, and testified as to stashed places he personally saw, including a speaker and "a cabinet that set in the corner of the barn, and there was a gap between the top of it and the ceiling that that's where he kept it." *Id.* at 199. During cross-examination, defense counsel asked about the specific timeframe of the transactions and the following exchange occurred:

Q. Okay. Over this year, about what calendar day of the year are we talking about to start the period of a year?

A. Oh it was just all through the month, each month.

Q. When we're talking about a year that you purchased, are we talking the year 2005? Or are we talking the year 2010? What year are we talking about?

A. It would be 2016, '17.

*Id.* at 200. When defense counsel asked whether "that end[ed] shortly after he moved in," Nail answered affirmatively, and when defense counsel asked if the drug activity happened around the first year Eldridge was there, Nail answered affirmatively and stated that it started right away. *Id.* at 201. Defense counsel moved to strike and the court overruled the motion. *Id.*

[12] Shawn Grubb, who lived at a different address on the 600 block of North Main Street and was present on July 2nd when the police arrived at Eldridge's shed, answered affirmatively when he was shown the July 2, 2018 photograph of Eldridge and asked if he recognized him.

[13] After the State rested, Eldridge made a motion for judgment on the evidence asserting that the State had not proved Eldridge's identity. The court denied the motion and found the State "did put in through exhibit 21 a photograph of his Indiana Operator license that indicates his DLN, which the [c]ourt finds to be sufficient in conjunction with his photograph, and the address on that identified

the defendant." *Id.* In proposing a final jury instruction,[5] Eldridge's counsel argued it was important for the jury to know that quantity "alone is not enough for them to support as that has potentially been argued by the State and through its questioning of witnesses." Transcript Volume II at 239. The prosecutor objected, and the court denied the proposed instruction, indicating that there had been no "inference of, or suggestion of a presumption against the defendant" aside from the tendered instruction and that there would be more of a likelihood to confuse the jury rather than just rely on its own instruction, which allowed the jury "to give what weight they find convincing as to each bit of evidence, and that they can draw inferences from it, under circumstantial evidence as they see fit." *Id.* at 240. Concerning another proposed final jury instruction,[6] Eldridge's counsel argued that its language seemed to be on point given testimony from multiple witnesses that he was not in exclusive possession of the premises and the instruction "would be helpful to the jury in determining that just because he was there does not automatically mean that he gets to take the fall for everything within." *Id.* When the court asked if the decision was a "sufficiency review case

---

[5] The proposed final jury instruction stated: "Illegal possession of large quantities of narcotics does not create a presumption of intent to deliver, but may support an inference of intent." Appellant's Appendix Volume II at 119.

[6] The proposed final jury instruction stated: "When a person has exclusive possession of the premises in which contraband is found, he is assumed to know about the presence of the contraband and be capable of controlling it. However, when possession of the premises is not exclusive, the State must show additional circumstances that indicate the defendant's knowledge of the presence of the contraband and ability to control it. Such additional circumstances include incriminating statements by the defendant, attempted flight, a drug manufacturing setting, proximity of the defendant to the drugs, drugs being found in plain view, and the location of the drugs in proximity to the items owned by the defendant." Appellant's Appendix Volume II at 121 (internal citations omitted).

with regard to the language, or is this actually regarding an instruction with this language," defense counsel responded that the case was "under potential sufficiency review of the evidence" and the court denied the proposed instruction. *Id.* at 241. Eldridge rested his case without presenting any evidence.

[14] During closing argument, the prosecutor mentioned Nail testified:

> I bought drugs from that guy, from that location up on top where it was. He saw him get drugs out when he bought them from him. That kind of suggests he knew they were there, don't you think?

*Id.* at 245. When the prosecutor addressed the third count, Eldridge objected to statements about the presence of school children and argued the evidence was stricken from the record, and the court ordered the argument stricken and instructed the jury not to consider it in assessing the evidence. The court told the prosecutor "to move on" after he indicated that the fifth count that the State had initially charged had "disappeared" upon chemical testing of the substance that was alleged to have been cocaine, and the prosecutor proceeded to summarize the remaining charges. *Id.* at 248.

[15] During its closing argument, defense counsel challenged the jurors to ask themselves if the State proved the identity of the defendant beyond a reasonable doubt and asked if a picture was enough. He argued that, when police arrived with a search warrant, Eldridge remained outside "[w]hich you would think is not an unreasonable thing to do for someone that knows there's a big bag of meth inside his shed." Transcript Volume III at 4. Defense counsel questioned what would have been shown by pictures of the shed's interior that had "disappeared

somehow" and argued that the numerous non-contraband items of Eldridge's which were found at the scene did not prove anything and that their presentation by the State signified a worry about meeting its burden. *Id.* He stated that, at one point, Officer Coryell's testimony was

> he'd arrested this . . . person a couple of weeks prior, coming from that place where he had meth. Well, then . . . after I was able to refresh his recollection with a transcript, oh, well, actually no, we had bought pills. Well, were there any pills found in this shed? How does that make sense. This seems inconsistent.

*Id.* at 7. Addressing Nail's testimony, he stated:

> So the best evidence that we have was back here, 2016, '17 sometime, if you can believe [] Nail, the defendant sold him drugs. On a fairly consistent basis. I'm going to give Mr. Nail that testimony. We don't know what was going on between the time that stopped and July 2nd, 2018. Maybe he started out with a bag of three hundred grams and sold it down and then came up and said, you know, I'm not going to do this anymore, [Poore], you just take over, or [the third individual present at the shed], you take over, or somebody else, some of these hundreds or however many people that are coming and going, maybe it was all gone. Maybe he thought it's gone. . . . Who's to say that he still really knew that it was there on July 2nd, 2018?

*Id.* at 9. He addressed the issue of the shed's proximity to the school, argued there was no evidence about whether there was be children at a school on July 2nd in the middle of the summer, and asked: "Is it reasonable to expect that kids are going to be in . . [.] at school during the summer? . . . Even so, again, knowledge. Did he know?" *Id.* at 10.

[16]   The prosecutor began the State's rebuttal by stating that the jurors knew Eldridge was a drug dealer because there was sworn testimony he dealt drugs, and he indicated that the court would instruct them, as it had already instructed the previous morning, that "what I'm telling you right now is not evidence. Nothing I have said before, or now, is evidence." *Id.* at 13. He stated that defense counsel had speculated about how the police not finding pills on Eldridge "shows that somehow or other drug dealing was not occurring there," and argued that such a fact merely demonstrated police did not find any pills. *Id.* at 15. In closing, the prosecutor reminded the jury that its burden was not "beyond all doubt" but "beyond a reasonable doubt," argued Eldridge was a "drug dealer, pure and simple" and a "fairly good sized drug dealer," and concluded:

> Martinsville is not that big of a community that five ounces of meth disappears overnight. This isn't Indianapolis where they can move real quantities. That's a lot of dope. It's a lot of dope going into the community. It's a lot of dope that [] Eldridge was making money off of and it was a lot of people being victimized by having that poison pumped into their veins. Go back in there, think about what you've heard, come to the obvious conclusion, and bring back a verdicts [sic] of guilty on each charge. And then when you go home, you'll be able to sleep. Thank you.

*Id.* at 20.

[17]   In its final jury instructions, the court explained that the jurors had the right to determine both the law and the facts. After reading the definition of dealing in methamphetamine, it instructed: "Before you may convict the defendant, the State must have proved each of the following beyond a reasonable doubt. One,

the defendant, two, possessed with intent to deliver, three, methamphetamine, four, and the amount of the drug involved was at least ten grams." *Id.* at 23. It continued that, if the State failed to prove each of these elements beyond a reasonable doubt, the jury must find the defendant not guilty of dealing in methamphetamine. The court instructed on the concept of possession[7] and further instructed: if possession of property constitutes any part of the prohibited conduct it is a defense that the person who possessed the property was not aware of his possession for a time sufficient for him to have terminated his possession; a person's mere presence in a place where contraband is found is insufficient to support a finding of possession; and that the State must prove beyond a reasonable doubt that the accused had the intent to maintain dominion and control over the item charged in the offense. It instructed that the jurors were "the exclusive judges of the evidence which may be either witness testimony or exhibits," statements by the attorneys were not evidence, that the parties may prove a fact by one of two types of evidence: "Direct evidence or circumstantial evidence. . . . Circumstantial evidence is indirect proof of a fact. . . . You may consider both direct evidence and circumstantial evidence as proof." *Id.* at 28-29.

---

[7] The transcription of the final jury instruction as provided for in the transcript appears to contain a scrivener's error. Final Jury Instruction No. 6, which contains an "X" indicating it was tendered, states: "The concept of 'possession' means to own or exercise control over. Under the law there are two kinds of 'possession' – direct physical possession and indirect possession. Either kind of possession can be considered in this case. A person who knowingly has direct physical control of a thing at a given time is then in possession of it. A person who, although not in direct physical possession, knowingly has both the authority and the intention to exercise control over a thing, either directly or through another person or persons, is then in indirect possession of it. Possession may be sole or joint. If one person alone has actual or constructive possession of a thing, then possession is sole. If two or more persons share actual or constructive possession of a thing, then possession is joint." Appellant's Appendix Volume II at 129.

The jury found Eldridge guilty as charged, and the court merged the conviction for possession of methamphetamine as a level 3 felony into that for dealing in methamphetamine as a level 2 felony, and the conviction for possession of a narcotic drug as a level 5 felony into that for possession of a narcotic drug as a level 4 felony.

## *Discussion*

### I.

The first issue is whether the trial court abused its discretion in denying Eldridge's motion for mistrial. Eldridge argues that, had he been provided the additional photographs about which Officer St. John testified, "showing the location and proximity of items found," he would "potentially have stood in a better position of showing distance between himself and the items, thus the potential that the pictures were exculpatory in nature." Appellant's Brief at 14. Specifically, he argues "[s]uch pictures would show the relative location of contraband property and the open, plain location (or lack thereof) of other items," Appellant's Reply Brief at 5; that, since the State relies upon the location of items within the shed, the photos could have provided a legitimate reasonable doubt in this case involving constructive possession; and that their suppression amounted to a constitutional violation.

"[A] mistrial is an extreme remedy that is only justified when other remedial measures are insufficient to rectify the situation." *Isom v. State*, 31 N.E.3d 469, 481 (Ind. 2015) (quoting *Mickens v. State*, 742 N.E.2d 927, 929 (Ind. 2001)), *reh'g*

*denied*, *cert. denied*, 136 S. Ct. 1161 (2016). The Indiana Supreme Court has explained: "A trial court is in the best position to evaluate whether a mistrial is warranted because it can assess first-hand all relevant facts and circumstances and their impact on the jury." *Ramirez v. State*, 7 N.E.3d 933, 935 (Ind. 2014). "We afford great deference to the trial court's decision." *Treadway v. State*, 924 N.E.2d 621, 628 (Ind. 2010). "We therefore review denial of a motion for mistrial only for abuse of discretion. However, the correct legal standard for a mistrial is a pure question of law, which we review de novo." *Ramirez*, 7 N.E.3d at 935 (citations omitted).

[20] Both parties cite to *California v. Trombetta* for the proposition that "[w]hatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense." 467 U.S. 479, 488 (1984). In *Noojin v. State*, the Indiana Supreme Court explained that "[t]o meet this standard of constitutional materiality, evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." 730 N.E.2d 672, 675 (Ind. 2000) (quoting *Trombetta*, 467 U.S. at 488-489; *Holder v. State*, 571 N.E.2d 1250, 1255 (Ind. 1991)). "Exculpatory evidence is defined as '[e]vidence tending to establish a criminal defendant's innocence.'" *State v. Durrett*, 923 N.E.2d 449, 453 (Ind. Ct. App. 2010) (quoting BLACK'S LAW DICTIONARY 597 (8th ed. 2004)). "The Court has also held that the failure to preserve 'potentially useful evidence' – as opposed to material exculpatory

evidence – violates the Fourteenth Amendment only when the defendant can show bad faith on the part of police." *Noojin*, 730 N.E.2d at 676 (citing *Arizona v. Youngblood*, 488 U.S. 51, 58, 109 S. Ct. 333 (1988)).

[21] The State presented testimony that officers lifted the tile of a drop ceiling of a shed approximately the size of a jury box that Eldridge had lived in for at least three years before they located two black pouches, one of which contained 134.75 grams of methamphetamine and the other of which contained 7.35 grams of heroin, spoons, syringes, and cotton ball ends. Inside a cabinet, the officers found a bag which held .11 grams of buprenorphine. Inside a false compartment designed to be a wall outlet, officers uncovered five clear plastic bags containing a green leafy substance believed to be marijuana and a glass pipe. There was also testimony that a black pouch containing at least one set of digital scales and a needle box lay on the floor next to the couch, and a box of sandwich bags lay in the southeast corner of the room. When Eldridge renewed his motion for mistrial, the court allowed him to recall and cross-examine Officer St. John who stated, "I'm not sure if they didn't get uploaded" and "[s]ince my departure, those computers have been replaced," Transcript Volume II at 152, the prosecutor indicated it had provided Eldridge with over fifty photographs, the court noted based on the testimony that it would characterize such photos as "lost, rather than destroyed," *id.* at 179, and Eldridge's counsel stated, "I'm not trying to imply malfeasance." *Id.* at 180.

[22] Even assuming the photographs about which Eldridge argues were to show noncontraband items, such as his license, in relative distant relation to the

locations where contraband property was discovered, we nevertheless cannot say that Eldridge has demonstrated the photographs would possess apparent exculpatory value of such nature that he would be unable to obtain comparable evidence by other reasonably available means, and thus we find that the trial court did not abuse its discretion when it denied his motion for mistrial.

## II.

[23] The next issue is whether the trial court abused its discretion by admitting Nail's testimony about previous drug purchases. The trial court has broad discretion to rule on the admissibility of evidence. *Bradley v. State*, 54 N.E.3d 996, 999 (Ind. 2016). A trial court's ruling on the admission of evidence is generally accorded a great deal of deference on appeal. *Hall v. State*, 36 N.E.3d 459, 466 (Ind. 2015), *reh'g denied*. We will not reverse an error in the admission of evidence if the error was harmless. *Turner v. State*, 953 N.E.2d 1039, 1058 (Ind. 2011). The erroneous admission of evidence which is cumulative of other evidence admitted without objection does not constitute reversible error. *Hoglund v. State*, 962 N.E.2d 1230, 1240 (Ind. 2012) (citation omitted), *reh'g denied*. Failure to timely object to the erroneous admission of evidence at trial will procedurally foreclose the raising of such error on appeal unless the admission constitutes fundamental error. *Stephenson v. State*, 29 N.E.3d 111, 118 (Ind. 2015). Additionally, we have found the issue waived where a defendant objected to only a portion of the challenged evidence. *See Dickey v. State*, 999 N.E.2d 919, 921 (Ind. Ct. App. 2013); *Hutcherson v. State*, 966 N.E.2d 766, 770 (Ind. Ct. App. 2012), *trans. denied*.

[24] Eldridge argues the prejudicial value of the testimony that Nail purchased drugs from him in 2016 and 2017 and that he pulled drugs from certain locations outweighs its probative value. He contends the events were removed and do not complete the story of the crime with which he was charged, and he asserts the prosecutor's closing argument addresses Nail's testimony and asks the jury to ignore the jury instructions and the State's burden. The State maintains the court could properly admit the challenged testimony under exceptions to Ind. Evid. Rule 404(b) and the probative value of the evidence outweighed its prejudicial effect.

[25] Ind. Evid. Rule 404(b) provides that evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character. Rule 404(b)(2) provides that "[t]his evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Ind. Evidence Rule 403 provides that the court may exclude relevant evidence if its probative value is substantially outweighed by a danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence.

[26] The record reveals that Eldridge did not object during direct examination as Nail: stated, "[y]eah, a few times," when asked if he ever saw Eldridge sell dope to anybody else; answered affirmatively when asked if he had meant more than three times; approximated his previous purchases of meth and heroin to three times a week; indicated he bought "a hundred times, three times a week for a

year" from Eldridge in his "house, home"; and testified that Eldridge had places for concealing drugs, including those he had personally seen: a speaker and a cabinet set in the corner. Transcript Volume II at 198. Eldridge moved to strike Nail's testimony only after his statement – in response to being asked during cross-examination several questions aimed at identifying the range of dates involved – that it "would be 2016, '17," *id.* at 200, and defense counsel's subsequent question inquiring whether the drug activity occurred "around the first year he was there." *Id.* at 201.

[27] Under the circumstances described above and in the record, we find no reversible error on this basis, *see Brown v. State*, 929 N.E.2d 204, 207 (Ind. 2010) ("A contemporaneous objection at the time the evidence is introduced at trial is required to preserve the issue for appeal, whether or not the appellant has filed a pretrial motion to suppress."), *reh'g denied*, and we cannot say the challenged evidence related solely to character and not for other purposes, such as knowledge or identity, or that its prejudicial effect outweighed its probative value.

III.

[28] The next issue is whether the prosecutor committed misconduct during closing argument which resulted in fundamental error. Eldridge argues the State's closing argument amounted to a due process violation that ensured he would not receive a fair trial. He contends that, after evidence of children being present at the school was stricken, the State attempted to play on the sympathy of the jury

and that, without sworn testimony that Eldridge had dealt methamphetamine on July 2, 2018, the State asked the jury to convict him for something which occurred between 2016 and 2017.

[29] In reviewing a properly preserved claim of prosecutorial misconduct, we determine: (1) whether the prosecutor engaged in misconduct, and if so, (2) whether the misconduct, under all of the circumstances, placed the defendant in a position of grave peril to which he should not have been subjected. *Cooper v. State*, 854 N.E.2d 831, 835 (Ind. 2006). Whether a prosecutor's argument constitutes misconduct is measured by reference to caselaw and the Rules of Professional Conduct. *Id.* The gravity of peril is measured by the probable persuasive effect of the misconduct on the jury's decision rather than the degree of impropriety of the conduct. *Id.* When an improper argument is alleged to have been made, the correct procedure is to request the trial court to admonish the jury. *Id.* If the party is not satisfied with the admonishment, then he should move for mistrial. *Id.* Failure to request an admonishment or to move for mistrial results in waiver. *Id.*

[30] Eldridge did not move for mistrial based on the challenged statements. Where, as here, a claim of prosecutorial misconduct has not been properly preserved, our standard of review is different from that of a properly preserved claim. *Id.* More specifically, the defendant must establish not only the grounds for the misconduct, but also the additional grounds for fundamental error. *Id.* Fundamental error is an extremely narrow exception that allows a defendant to avoid waiver of an issue. *Id.* It is error that makes "a fair trial impossible or

constituted a clearly blatant violation of basic and elementary principles of due process presenting an undeniable and substantial potential for harm." *Durden v. State*, 99 N.E.3d 645, 652 (Ind. 2018). "This exception is available only in 'egregious circumstances.'" *Brown*, 929 N.E.2d at 207 (quoting *Brown v. State*, 799 N.E.2d 1064, 1068 (Ind. 2003)). "Fundamental error is meant to permit appellate courts a means to correct the most egregious and blatant trial errors that otherwise would have been procedurally barred, not to provide a second bite at the apple for defense counsel who ignorantly, carelessly, or strategically fail to preserve an error." *Ryan v. State*, 9 N.E.3d 663, 668 (Ind. 2014), *reh'g denied*.

[31]     During closing argument, the prosecutor mentioned Nail, who saw Eldridge "get drugs out when he bought them from him," and argued of Eldridge: "That kind of suggests he knew they were there, don't you think?" Transcript Volume II at 245. When the prosecutor mentioned the testimony involving the presence of children at the school, Eldridge objected and the court ordered the argument stricken and instructed to jury not to consider it in assessing the evidence. In the context of summarizing the charges for the jury, the prosecutor mentioned the fifth count which it had initially charged, explained the reason for its dismissal, and proceeded when prompted to by the court.

[32]     We observe that, in his closing argument, Eldridge's counsel pointed to Officer Coryell's recollection of the purchase of pills in the shed, argued that it was unknown "what was going on" from the point in time when Nail stopped purchasing drugs from Eldridge until July 2, 2018, and introduced hypothetical scenarios in which Eldridge ceded control of the drugs to another party or in

which he thought "it's gone." Transcript Volume III at 9. We further note that, in the beginning of the State's rebuttal, the prosecutor reminded the jury that the court was "going to instruct you, has already instructed you yesterday morning, that what I'm telling you right now is not evidence," and "[n]othing I have said before, or now, is evidence," *id.* at 13, and the court subsequently admonished jurors in the final instructions they were the exclusive judges of the evidence "which may be either witness testimony or exhibits," that statements by the attorneys were not evidence, and that a finding of guilty of dealing in methamphetamine required the State to prove beyond a reasonable doubt that Eldridge "possessed with intent to deliver." *Id.* at 23, 28. Under the circumstances, we cannot say Eldridge has shown that any misconduct during the prosecutor's argument made a fair trial impossible or demonstrated the "extremely narrow" exception of fundamental error. *Durden*, 99 N.E.3d at 652.

[33] With respect to Eldridge's challenge to the prosecutor's final remarks that he was profiting from people being victimized and "having that poison pumped into their veins" and that if the jurors returned guilty verdicts, they would "go home . . . [and] be able to sleep," Appellant's Brief at 21, we note that it may be misconduct for a prosecutor to ask a jury to convict a defendant for any reason other than his or her guilt, or to attempt to inflame the passions or prejudices of the jury. *Wisehart v. State*, 693 N.E.2d 23, 59 (Ind. 1998). Indeed, the Indiana Supreme Court has disapproved of prosecutors invoking a general concern for "community safety" as a legitimate basis for returning a guilty verdict. *See Maldonado v. State*, 265 Ind. 492, 501, 355 N.E.2d 843, 849 (1976) (finding error

in the prosecutor arguing, "this may be the most important thing you'll ever do for your community"). However, Eldridge brings his challenge under the fundamental error exception. Even if we assumed some of the prosecutor's arguments or comments were misconduct, we are not persuaded that such comments created "an undeniable and substantial potential for harm." *Durden*, 99 N.E.3d at 652. We find Eldridge is not entitled to a new trial on this basis.

IV.

[34] The next issue is whether the court erred in refusing Eldridge's proposed jury instructions. Eldridge maintains the jury should have been provided with an instruction that "more was necessary than simply possession of a certain amount of drugs" and that the first proposed instruction was necessary to educate the jury of the difference between "Dealing in Methamphetamine (Possession with Intent) (Ind. Code § 35-48-4-1.1(a)(2) and Ind. Code § 35-48-4-1.1(e)(1)) and Possession of Methamphetamine (Ind. Code § 35-48-4-6.1(a) and Ind. Code § 35-48-4-6.1(d)(1);) of the same amount." Appellant's Brief at 23-24. He argues the second proposed instruction would have properly and thoroughly instructed the jury on the legal evaluation of a constructive possession case and placed it "in a better position to weigh the evidence . . . and possibly would have avoided the need for this appeal." *Id.* at 24.

[35] The purpose of an instruction is "to inform the jury of the law applicable to the facts without misleading the jury and to enable it to comprehend the case clearly and arrive at a just, fair, and correct verdict." *Overstreet v. State*, 783 N.E.2d 1140,

1163 (Ind. 2003), *cert. denied*, 540 U.S. 1150, 124 S. Ct. 1145 (2004). Instruction of the jury is generally within the discretion of the trial court and is reviewed only for an abuse of that discretion. *Id.* at 1163-1164. To constitute an abuse of discretion, the instruction given must be erroneous, and the instructions taken as a whole must misstate the law or otherwise mislead the jury. *Benefiel v. State*, 716 N.E.2d 906, 914 (Ind. 1999), *reh'g denied*, *cert. denied*, 531 U.S. 830, 121 S. Ct. 83 (2000). A trial court erroneously refuses to give a tendered instruction, or part of one, if: (1) the instruction correctly sets out the law; (2) evidence supports the giving of the instruction; and (3) the substance of the tendered instruction is not covered by the other instructions given. *See Overstreet*, 783 N.E.2d at 1164. Before a defendant is entitled to a reversal, he must affirmatively show that the erroneous instruction prejudiced his substantial rights. *Lee v. State*, 964 N.E.2d 859, 862 (Ind. Ct. App. 2012) (citing *Gantt v. State*, 825 N.E.2d 874, 877 (Ind. Ct. App. 2005)), *trans. denied*. An error is to be disregarded as harmless unless it affects the substantial rights of a party. *Id.* (citing *Oatts v. State*, 899 N.E.2d 714, 727 (Ind. Ct. App. 2009); Ind. Trial Rule 61).

[36] Here, officers found 134.75 grams of methamphetamine, the value of which Officer St. John testified would be "several hundred dollars, if not into the thousands worth." Transcript Volume II at 76. Officer Coryell testified that "the average user is going to use about a quarter of a gram a day depending upon their habit." *Id.* at 103. In response to the first proposed final jury instruction that "Illegal possession of large quantities of narcotics does not create a presumption of intent to deliver, but may support an inference of intent," Appellant's

Appendix Volume II at 119, the court noted there had been no inference or suggestion of a presumption against Eldridge aside from his proposed instruction and that there would be more of a likelihood to confuse the jury, and ultimately instructed the jury that, for it to find Eldridge guilty of dealing in methamphetamine, the State had to prove beyond a reasonable doubt that he possessed "with intent to deliver" otherwise, "they must not find the defendant not guilty of dealing in methamphetamine, a level 2 felony, as charged in count one." Transcript Volume III at 23. In conjunction with the instruction that circumstantial evidence could prove a fact, the final instructions allowed the jury to consider the methamphetamine weight in determining Eldridge's intent. Taking the instructions as a whole, and in light of the quantity of possessed methamphetamine, we thus find reversal is not warranted on this basis.

[37] With regard to the second proposed jury instruction, we note the extensive final instructions provided to the jury on: direct and indirect possession; the insufficiency in finding possession supported merely by presence in a place where contraband is found; a defense relating to the termination of possession by way of being unaware for a sufficient time; and the State's requirement to prove beyond a reasonable doubt the accused had the intent to maintain dominion and control over the item charged in the offense. *See* Transcript Volume III at 22-23, 27. Because the substance of Eldridge's proposed instruction was covered by such other given instructions, we conclude the trial court did not abuse its discretion. *See Newman v. State*, 505 N.E.2d 442, 445 (Ind. 1987) (holding that the trial court did not err in refusing to give the defendant's tendered instructions because the

substance of appellant's tendered instructions were covered by the court's other instructions); *Lewis v. State*, 898 N.E.2d 429, 434 (Ind. Ct. App. 2008) (holding that the substance of the defendant's tendered instructions were covered by the instructions given by the trial court and the trial court did not abuse its discretion when it refused to give the defendant's proposed jury instructions), *trans. denied*.

V.

The next issue is whether the evidence is sufficient to sustain Eldridge's convictions. He argues that, to ensure due process, proof of identifying information must "confirm the jury intended to convict the same Joshua Ryan Eldridge who is a party of this proceeding," and contends the date of birth in the photograph of the driver's license is obscured. Appellant's Brief at 25. He contends "weight alone" was relied on regarding the conviction for possession of methamphetamine with intent to deliver and that such reliance was clearly erroneous. *Id.* at 26. He argues the State lacked any evidence he knowingly possessed anything on July 2, 2018, and contends it did not demonstrate additional circumstances indicating an ability to control any contraband.

When reviewing claims of insufficiency of the evidence, we do not reweigh the evidence or judge the credibility of witnesses. *Jordan v. State*, 656 N.E.2d 816, 817 (Ind. 1995), *reh'g denied*. We look to the evidence and the reasonable inferences therefrom that support the verdict. *Id.* Elements of offenses and identity may be established entirely by circumstantial evidence and the logical inferences drawn therefrom. *Bustamante v. State*, 557 N.E.2d 1313, 1317 (Ind.

1990).  On appellate review of circumstantial evidence of guilt, this Court need not determine whether the circumstantial evidence is adequate to overcome every reasonable hypothesis of innocence, but rather whether inferences may be reasonably drawn from that evidence which support the verdict beyond a reasonable doubt.  *See id.* at 1318.  Identification testimony need not necessarily be unequivocal to sustain a conviction.  *Heeter v. State*, 661 N.E.2d 612, 616 (Ind. Ct. App. 1996).  Also, a conviction may be sustained on the uncorroborated testimony of a single witness or victim.  *Baltimore v. State*, 878 N.E.2d 253, 258 (Ind. Ct. App. 2007), *trans. denied*.  The conviction will be affirmed if there exists evidence of probative value from which a reasonable jury could find the defendant guilty beyond a reasonable doubt.  *Jordan*, 656 N.E.2d at 817.

[40]   With respect to identity, the record reveals the State presented the testimony of Nail, who indicated he lived in the other outbuilding on the same lot as Eldridge, identified Eldridge when shown the July 2, 2018 photograph that Officers St. John and Coryell testified accurately portrayed Eldridge's appearance, and agreed that he was certain the photograph was of Eldridge.  Nail's testimony is consistent with Grubb's testimony.  Eldridge's arguments about his identity amount to an invitation to reweigh the evidence, which we will not do.

[41]   We turn to the conviction for possession of methamphetamine with intent to deliver.  To convict Eldridge of level 2 felony dealing in methamphetamine, the State was required to prove beyond a reasonable doubt that he possessed methamphetamine with intent to deliver it and that he possessed an amount of at least ten grams.  *See* Ind. Code §§ 35-48-4-1.1(a)(2), -(e)(1).  In addition to finding

the jury could consider the weight of the methamphetamine when determining intent to deliver, we find that, on the evidence described above and within the record, the State provided additional evidence of probative value from which a reasonable jury could find Eldridge had the requisite intent to deal methamphetamine. Accordingly, we conclude the evidence is sufficient to support his conviction.

[42] Similarly, we find the State has demonstrated additional circumstances indicating Eldridge's capability and intent to maintain dominion and control over the contraband and knowledge of its presence when it provided uncontradicted evidence establishing: officers uncovered contraband and discovered other items belonging to Eldridge in a single-room shed which contained the furnishings of a dwelling and in which he had lived for "about three or four years"; that Eldridge's driver's license, found inside the shed, listed the address of the residence behind which the shed sat; and that Eldridge stood "just outside" the shed when officers approached. Under these circumstances and in light of the record, we conclude that evidence of probative value exists from which the jury as trier of fact could find that Eldridge had constructive possession of the contraband and could have found him guilty beyond a reasonable doubt as charged.

[43] To the extent that Eldridge points to the charging information as alleged and argues the count of possession of a narcotic drug as a level 4 felony requires the State to have proven that possession occurred within five hundred feet of school property where a person under eighteen years of age was "reasonably expected to

be," Appellant's Brief at 27, he contends it not reasonable to expect a person under eighteen years of age "to be at school on July 2nd, a time at which children are traditionally absent from school premises." Appellant's Reply Brief at 11. He asserts the only testimony of children being present at the school was stricken as hearsay. We note that the jury was presented with the testimony of Officer Coryell, who indicated that he made an effort to find out if there were any students present on July 2nd and testified that he "spoke with two members of the faculty there" at the North School and "[t]hey have, it's . . . at the time it was called Martinsville Head Start . . . which is run by the MSD, the Metropolitan School District of Martinsville."[8] Transcript Volume II at 101. The reasoning in *McAlpin v. State*, 80 N.E.3d 157 (Ind. 2017), is instructive. The *McAlpin* Court discussed the "reasonably expected" standard in Ind. Code § 35-48-1-16.5 and stated:

> Like the "reasonable care" standard in negligence law and the "reasonably expectable [use]" standard under Indiana's Products Liability Act, the enhancement's "reasonably expected" element does not rely on anyone's subjective expectation. It does not require proof, for example, that the defendant actually anticipated that a child would be in the park. Instead, it asks what the ordinary reasonable person would expect under the circumstances. And that objective, fact-intensive standard is "best applied by a jury after hearing all of the evidence." After all, the jury is a body

---

[8] Eldridge objected on hearsay grounds as Officer Coryell stated: "I spoke with two separate people there and they said they had approximately eighteen kids . . ." Transcript Volume II at 101.

of citizens whose collective experience allows it to "draw wiser and safer conclusions" than any one person could.

80 N.E.3d at 162 (internal citations omitted). The Court rejected a defendant's argument that the State need to have presented "what he calls the 'best evidence'" – that children typically use the park "even while school is in session" – and framed the inquiry as "not whether the verdict was based on the 'best evidence' but whether it was based on a reasonable inference." *Id.* at 163. Here, the jury was shown "an aerial photo of the north end of town," and Officer Coryell identified and marked North School and the shed. Transcript Volume II at 132. Based on the record, we find that the jury could reasonably conclude Martinsville Head Start, run by the Metropolitan School District of Martinsville, resulted in the presence of children on July 2nd, and we decline Eldridge's invitation to invade the jury's province. *See McAlpin*, 80 N.E.3d at 163 ("In sum, this is a fact-sensitive issue that we ask juries to resolve by drawing - or not drawing – certain inferences. We 'trust juries to make such inferential decisions; not because they are infallible, but because they have the clearest view of the evidence to sift through subtle contextual factors. In making those judgment calls, the jury applies its 'experiences in life,' 'common sense,' and the 'conscience of our society' as it 'take[s] into account all of the facts and circumstances.' With that in mind, we decline McAlpin's invitation to invade the jury's province and thus reject his sufficiency claim.") (internal citations omitted).

[44] For the foregoing reasons, we affirm Eldridge's convictions.

[45]     Affirmed.

Najam, J., and Kirsch, J., concur.